UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| HOLSUM DE PUERTO RICO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:18-cv-02004-JAW |
| | ) | |
| COMPASS INDUSTRIAL GROUP | ) | |
| LLC; ILLINOIS TOOL WORKS, INC.; | ) | |
| ITW FOOD EQUIPMENT GROUP | ) | |
| LLC d/b/a PEERLESS FOOD | ) | |
| EQUIPMENT; INSURANCE | ) | |
| COMPANY ABC; INSURANCE | ) | |
| COMPANY DEF; INSURANCE | ) | |
| COMPANY XYZ, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PEERLESS' MOTION FOR ATTORNEY'S FEES**

Following a two-week trial, a prevailing defendant argues that it is entitled to reasonable attorney's fees pursuant to the parties' contract, or, in the alternative, pursuant to Puerto Rico Rule of Civil Procedure 44 against the plaintiff who filed and pursued the unsuccessful lawsuit. The Court concludes that the fee-shifting provision of the parties' contract was not properly incorporated by reference so as to give the plaintiff adequate notice of its existence, and, in the alternative, that the defendant has not shown that the plaintiff acted obstinately under Rule 44. The Court denies the defendant's motion for attorney's fees.

## I.    PROCEDURAL BACKGROUND

On December 26, 2018, Holsum de Puerto Rico, Inc. (Holsum) filed a two-count complaint against Compass Industrial Group, LLC (Compass) alleging breach of

contract and negligence. *Compl.* at 6-7 (ECF No. 1). On April 2, 2019, Compass answered the Complaint and filed a breach of contract counterclaim against Holsum. *Answer to Compl. and Counterclaim* (ECF No. 18). On May 13, 2019, Holsum filed an amended complaint adding ITW Food Equipment Group LLC d/b/a Peerless Food Equipment (Peerless) as a defendant and alleging breach of contract and negligence. *Am. Compl.* at 9-10 (ECF No. 36).

From March 28 to April 8, 2022, this Court presided over a jury trial to resolve Holsum's breach of contract and negligence claims against Compass and Peerless, and Compass' breach of contract counterclaim against Holsum. *See Order* (ECF No. 241). After two weeks of evidentiary presentations the jury found: (1) in favor of Holsum on Holsum's claim against Compass in the amount of $ 518,295.00; (2) in favor of Peerless on Holsum's claim against it; and (3) in favor of Compass against Holsum in the amount of $151,217.40.00 on Compass' counterclaim. *Jury Verdict Form* (ECF No. 260); *J.* (ECF No. 266) (*J.*).

On April 22, 2022, Peerless filed a motion for attorney's fees against Holsum. *ITW Food Equipment Group LLC D/B/A Peerless Food Equipment's Mot. for Att'y's Fees and Expenses* (ECF No. 270) (*Peerless' Mot.*). Peerless filed "Exhibit B" to its declaration in support of its motion for attorney's fees that same day. *ITW Food Equipment Group LLC D/B/A Peerless Food Equipment's Mot. Submitting Ex. B to Decl. in Supp. of Mot. for Att'y's Fees and Expenses for Restricted Viewing Under Standing Order No. 9* (ECF No. 272) (*Peerless' Ex. B*). On May 25, 2022, Holsum responded in opposition to Peerless' motion for attorney's fees. *Opp'n to ITW Food*

*Equipment Group, LLC d/b/a Peerless Food Equipment's ("Peerless") Mot. for Att'y's Fees at Docket No. 270* (ECF No. 301) (*Holsum's Opp'n*).  On May 31, 2022, Peerless replied to Holsum's opposition.  *ITW Food Equipment Group LLC D/B/A Peerless Food Equipment's Reply to Holsum de Puerto Rico, Inc.'s Opp'n to Mot. for Att'y's Fees and Expenses* (ECF No. 306) (*Peerless' Reply*).  With leave of the Court, Holsum filed a sur-reply on June 7, 2022.  *Sur-Reply to ITW Food Equipment Group, LLC d/b/a Peerless Food Equipment's ("Peerless") Reply to Holsum's Opp'n to Peerless's Request for Att'y's Fees* (ECF No. 311) (*Holsum's Sur-Reply*).

## II.   THE PARTIES' POSITIONS

### A.   Peerless' Motion for Attorney's Fees

Peerless argues that it "is entitled to an award of its reasonable attorney's fees and expenses on two grounds: under the terms of its Agreement with Holsum, which contains a fee-shifting provision, and pursuant to Rule 44.1(d) of the Puerto Rico Rules of Civil Procedure."  *Peerless' Mot.* at 1.  To its first point, Peerless says that the warranty section of the parties' contract directs Holsum to a complete list of Terms and Conditions on Peerless' website, which includes a "Limitation of Actions/Choice of Law/Litigation Costs" provision that stipulates that "the prevailing party is entitled, in addition to the relief granted, to a reasonable sum for their attorney's fees in such litigation."  *Id.* at 2 (emphasis omitted).

As to the application of Rule 44.1, Peerless argues that Holsum acted "obstinately and frivolously" based on the circumstances of the case.  *Id.* at 3-4.  In particular, Peerless says that Holsum acted "obstinately and frivolously" by including Peerless as a defendant in this case "based on the mere allegations in Compass's

Answer to the Complaint and Counterclaim," and through its unwillingness to settle the case at multiple junctures. *Id.* at 4, 10.

Peerless recounts Holsum's allegations in light of Puerto Rico breach of contract law and argues that "[t]he terms of [its contract with Holsum] were clear[;] . . . Holsum tendered payment to Peerless[;] . . . Peerless fully and timely complied with its contractual requirements[;] . . . [and] [t]he sandwiching machine was able and capable of undertaking the Cameo cookie project." *Id.* at 7.  Peerless submits that it "honored its agreement and warranty, and always acted in good faith with proper care" and that its Food Equipment "Warranty expressly precluded the type and nature of the remedies specifically claimed by Holsum in its Amended Complaint." *Id.* at 8.  In essence, Peerless claims that "Holsum knew or should have known that it would not be able to prove two elements of its contract claim against [it]: a breach and resulting damages." *Id.*

As to Holsum's negligence claim against it, Peerless argues that "Holsum knew, or should have known, that any claim for negligence against Peerless had to arise out of conditions completely separate from the parties' contract" but that "Holsum's allegations about negligence [in the Amended Complaint] merely mirrored its allegations of a breach of the contract with Peerless."  *Id.* at 8-9.  As a result, Peerless says that Holsum "does not have a separate cause of action for negligence." *Id.* at 9.

To its second point, Peerless argues that "Holsum had many opportunities to settle its claims against Peerless and refused to do so."  *Id.* at 10.  It explains that the

parties held settlement conferences on August 26, 2019 and September 5, 2019, before then-Magistrate Judge Carreño-Coll; on February 2, 2020, Magistrate Judge Velez Rive held another settlement conference; on February 10, 2021, counsel for Holsum and Peerless met informally to discuss settlement; the parties met with a court-appointed mediator; and on March 17, 2022, Magistrate Judge Marcos López held a final pretrial settlement conference. *Id.* at 10-11.  Peerless says that "Holsum's position at each stage of settlement attempts was consistently disinterested in reaching a settlement without forcing Peerless to try the case." *Id.* at 11.  Peerless explains that such "recalcitrance" should make Holsum "liable to [it] for attorneys' fees under Rule 44.1(d)." *Id.*

Peerless also contends that it "is entitled to have its attorney's fees calculated using a hybrid lodestar-multifactor method." *Id.*  Although Peerless admits that the court is not required to award attorney's fees by multiplying the number of hours worked by the hourly rate, it argues that would be appropriate in this case because the rates charged, the hours expended, and the litigation expenses incurred were all reasonable. *Id.* at 11-15.  As to the reasonableness of the hourly rate charged, Peerless says that two partner-level attorneys and two associate-level attorneys worked on the case and each attorney's rate "reflect[s] the rates prevailing in the community in which the attorney works for persons of comparable skill and experience." *Id.* at 12.  Peerless also says that it was reasonable to expend a total of 1,342.25 hours on this case in answering the Amended Complaint, engaging in

discovery and depositions, filing procedural motions, engaging in settlement negotiations, and preparing and participating in trial. *Id.* at 13.

### B.    Holsum's Opposition

In opposition, Holsum maintains that "at no point has [it] acted in an 'obstinate' or 'frivolous' manner." *Holsum's Opp'n* at 2. Regarding Peerless' contractual arguments, Holsum argues that "Puerto Rico law controls the attorney's fees issue not the fee-shifting provision found in Peerless'[]" contract because the contract is one of adhesion. *Id.* at 6. It contends that the contract it signed with Peerless "contained a hyperlink, which in turn led to a 'second,' more extensive contract" and that it was only this second contract that included a provision for the payment of attorney's fees. *Id.* Such a provision, Holsum declares, "runs afoul of the 'laws, morals, or public order' requirement found in the Puerto Rico Civil Code." *Id.* at 7. As such, Holsum maintains that Peerless' ability to recover attorney's fees depends entirely on the issue of obstinacy. *Id.*

On that point, Holsum argues that its "claim against Peerless was 'theoretically actionable'" and that the admissions made by Peerless' trial witness, Jason Switzer, show the absence of obstinacy on Holsum's part. *Id.* at 7-9. In particular, Holsum maintains that the verdict in favor of Peerless was "close" because, based on a note submitted to the Court by the jury, "[t]he jury deliberated under the incorrect assumption that the 'machine part' installed by Holsum to manually load the cookies . . . was provided to Holsum by Peerless at no cost to Holsum --- as part of a warranty tendered by Peerless." *Id.* at 9.

Furthermore, Holsum argues that Peerless' request for attorney's fees is "devoid of any reasonableness" because Peerless itself engaged in "dilatory, costly, and frivolous" discovery tactics. *Id.* at 10. It points the Court to Peerless' February 12, 2021, motion to compel against Holsum, filed eight months after the June 15, 2020, discovery deadline, which Holsum declares "forced [it] to incur . . . further legal expense" and was nothing more than a "fishing expedition into Holsum's confidential business relationship with Mondelez International." *Id.* Holsum ultimately says that it was Compass who brought Peerless into the case, and Peerless and Holsum would likely not have gone to trial had Compass not "flat-out refus[ed] to engage in good faith negotiations on the eve of trial." *Id.* at 11.

### C.   Peerless' Reply

In reply, Peerless maintains that the fee-shifting provision of its contract with Holsum is enforceable under Puerto Rico law. *Peerless' Reply* at 2. First, it contends that "the contract between the parties is not an adhesion contract," even though Peerless drafted it and it was offered on a "take it or leave it" basis, because Holsum failed to prove "that the parties were greatly disparate in bargaining power" and "that there was no opportunity for negotiation." *Id.* at 3. Peerless further argues that even if the contract is one of adhesion, courts still routinely enforce such contracts unless they are "unconscionable or unfair." *Id.* at 3-4. It cites *Cooperativa de Ahorro y Crédito Sabaneña v. Casiano Rivera*, 184 D.P.R. 169, 2011 P.R. Sup. LEXIS 203, 2011 TSPR 207 (2011), where the Puerto Rico Supreme Court enforced a 33% attorney's fee provision because nullifying the clause "would be the equivalent to modifying or nullifying a statute, as contracts are the law between the parties." *Id.* at 5; *see also*

*ITW Food Equpment Group LLC D/B/A Peerless Food Equipment's Mot. Submitting Certified Translation of Cited Authority in its Reply to Holsum de Puerto Rico's Opp'n to its Mot. for Att'y's Fees*, Attach. 1, *Cooperativa de Ahorro y Crédito Sabaneña v. Casiano Rivera*, 184 D.P.R. 169, 2011 P.R. Sup. LEXIS 203, 2011 TSPR 207 (2011) (*Cooperativa*).

Peerless argues that, here, "Holsum and Peerless had conducted business with each other many times before the Cameo cookie project" and "knew each other and each other's commercial practices, including the terms and conditions under [which] each was willing to engage in business." *Id.* at 6. Thus, it submits that "[t]here is no showing that the language of the clause is obscure, that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation, or that a sandwiching machine could not be obtained elsewhere." *Id.*

As to the availability of attorney's fees under Rule 44.1(d), Peerless reiterates its arguments as to why it believes Holsum acted obstinately. *Id.* at 7. Furthermore, it rejects as "astonishing" Holsum's contention that Compass' allegations in its answer "caused Holsum to sue Peerless and to refuse to settle or dismiss its claims against it." *Id.* at 8. It characterizes this argument as "unavailing" because it was "Holsum, and Holsum alone, [that] added Peerless as a defendant in this case" and refused to settle or dismiss the claims against it. *Id.* at 9.

Finally, Peerless characterizes Holsum's argument on discovery tactics as "an attempt to deflect the attention from Holsum's own obstinate conduct in the litigation." *Id.* It says that the Mondelez motion to compel addressed the discrete

issue of "Holsum's inability or unwillingness to share the Cameo cookie specifications provided by Mondelez" which were "central to the issue of the design of the cookie sandwiching machine." *Id.* It further notes that the Court permitted Peerless to file this motion to compel in advance. *Id.* at 10 (citing *Scheduling Order*, ECF No. 116).

### D.    Holsum's Sur-Reply

Holsum filed a sur-reply to contest what it characterizes to be Peerless' "gross[] misread[ing]" of *Cooperativa de Ahorro y Crédito*. *Holsum's Sur-Reply* at 2. Specifically, it argues that Peerless omitted a footnote stating that "the [Puerto Rico Supreme Court] is not inclined to <u>automatically</u> enforce a penalty clause without first looking at the particular facts of each case." *Id.* (emphasis in original). It also contends that the Puerto Rico Supreme Court did not blindly enforce the payment provision at issue but modified it based on a "reasonableness" standard. *Id.* at 3. Holsum goes on to distinguish *Cooperativa* because there, the relevant clause was "visible and fully incorporated to the principal text" of the contract whereas in this case, Peerless' fee-shifting provision "was not visible or incorporated to the principal text." *Id.*

## III.    DISCUSSION

### A.    The Contract Fee-Shifting Provision

First, the Court must determine whether the fee-shifting provision incorporated by link into Peerless' contract with Holsum is binding on the parties under Puerto Rico law.[1]

### 1.    Legal Standard

"It is well-settled law that when a contract is unambiguous, its literal meaning must be applied." *Yordan v. Burleigh Point, Ltd.*, 552 F. Supp. 2d 200, 203 (D.P.R. 2007) (citing P.R. Laws Ann. tit. 31, § 3471).   "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."   *Id.* (quoting *Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo*, 96 F.3d 10, 14 (1st Cir. 1996)).   "An agreement is clear when it can be understood in one sense alone, without leaving any room for doubt, controversies or

---

[1]      Holsum argues that the fee shifting provision is not binding in part because the contract is one of adhesion.  A contract of adhesion is one "offered by the authoring party on a take it or leave it basis rather than being negotiated between the parties." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 19 n.7 (1st Cir. 2009) (quoting *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 377 (7th Cir. 1990)).  The First Circuit has made clear that "[t]he mere fact that a contract is one of adhesion does not render it per se unenforceable," *id.* at 19, because "Adhesion does not imply nullity of contract." *Id.*  (quoting *Nieves v. Intercontinental Life Ins. Co. of P.R.*, 964 F.2d 60, 63 (1st Cir. 1992)); *see also Cooperativa* at 6.  Even if valid, a contract of adhesion will be interpreted against the "economically weaker [party] . . . which had nothing to do with its drafting" if the language is ambiguous. *Cooperativa* at 6-7 ("Upon arriving to the conclusion that the clause is not ambiguous, we cannot apply the interpretation methods to adhesion contracts whereby the courts shall favor the party that did not intervene in the drafting process").  However, "[i]f the wording of the contract is explicit and its language is clear, its terms and conditions are binding on the parties." *Rivera*, 575 F.3d at 19 (quoting *Nieves*, 964 F.2d at 63).  Thus, with adhesion contracts, the Court's duty is to "assess the presence of ambiguous c[l]auses" and "[a]bsent ambiguity, the contract shall be interpreted according to the terms thereof." *Cooperativa* at 7.

Thus, even if the Court deemed the contract one of adhesion, that conclusion, alone, would not void the fee shifting provision.  The resolution of this dispute does not depend on whether the contract is one of adhesion, but rather whether the fee shifting provision was adequately incorporated by reference into the contract such that Holsum had reasonable notice of the provision.

difference of interpretation." *Comite Fiestas De La Calle San Sebastian, Inc. v. Cruz*, 170 F. Supp. 3d 271, 273 (D.P.R. 2016) (quoting *In re Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007)). "When a contract contains several sections or clauses, they 'should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together." *Id.* (quoting P.R. Laws Ann. tit. 31, § 3475).

"The Puerto Rico Supreme Court recognizes provisions incorporated by reference when interpreting contracts." *Id.* at 274. A contract provision "need not be contained in the parties' contract, but may be provided for in the contract by reference to outside documents . . . . [This] reference is generally sufficient to bind the parties." *Benitez-Navarro v. Gonzalez-Aponte*, 660 F. Supp. 2d 185, 191 (D.P.R. 2009) (quoting 1 DOMKE ON COMMERCIAL ARBITRATION § 8:5). When a contract term is incorporated by reference, "[a]bsent fraud, a person is deemed to know the contents of the contract that he or she signs. . . . Thus whether plaintiffs actually knew of the [contract] clause in their contracts is irrelevant; that knowledge is imputed as a matter of law." *Id.* (quoting *Rivera*, 575 F.3d at 10, 20-21). Moreover, "this presumption applies even when the signed document 'incorporate[s] by reference' a[] . . . provision 'that may be found' in another document, 'irrespective of whether [the party] received a copy of the document' containing the clause." *Id.* (quoting *Steelmasters, Inc. v. Local Union 580 of Int'l Ass'n of Bridge, Structural, Ornamental and Reinforcing Iron Workers*, No. 05-CV-259 (MDG), 2008 U.S. Dist. LEXIS 7687, at *13 (E.D.N.Y. Feb. 1, 2008)).

Whether an extrinsic provision is incorporated into the contract by reference depends on the language of the contract.  "Extrinsic materials may be incorporated into a contract by reference as long as 'the language used in the contract . . . clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Greene v. Ablon*, 794 F.3d 133, 145 (1st Cir. 2015) (quoting *NSTAR Elec. Co. v. Dep't of Pub. Utils.*, 968 N.E.2d 895, 905 (Mass. 2012)).  "Contracts need not 'use the traditional language of "incorporating by reference"' so long as 'language in the agreements clearly communicate[s] the purpose of incorporating the . . . clause." *Comite*, 170 F. Supp. 3d at 274 (quoting *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 43 (1st Cir. 2012)) ("[N]o such magic terms are required").

### 2. Analysis

Although the Puerto Rico Supreme Court has set forth general legal principles that apply to contracts that incorporate extrinsic terms by reference, the parties have not cited nor has the Court found authoritative law in Puerto Rico applying those principles to a contract's incorporation of terms by link to a website.  Therefore, the Court turns to decisions of courts in other jurisdictions that have squarely addressed the issue.[2]  As a threshold matter, the majority of other courts faced with the issue

---

[2]     "When a Civil Code and the Supreme Court of Puerto Rico are silent on an issue, [the Court] may forgo the traditional prohibition on use of common law principles and 'employ the common law in its multiple and rich versions . . . as a point of reference for comparative law." *Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 210 (1st Cir. 2019) (quoting *Valle v. Am. Int'l Ins. Co.*, 108 D.P.R. 692, 8 P.R. Offic. Trans. at 738 (1979)).  "That is particularly true when the Supreme Court of Puerto Rico has, on a particular subject, 'conformed its . . . jurisprudence to common law principles," which it has

12

have concluded that the principles of incorporation by reference apply where the additional terms and conditions appear on a website rather than as a paper document. *See, e.g.*, *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011) ("[U]nder admiralty law—which generally follows the common law of contracts in resolving maritime contract disputes—maritime contracts may validly incorporate terms from a website in the same manner that they may incorporate by reference terms from paper documents"); *Am. Specialty Lab, LLC v. GenTech Sci., Inc.*, No. 17-CV-1187S, 2020 U.S. Dist. LEXIS 163560, at *9 (W.D.N.Y. Sept. 8, 2020) (explaining that the principles of incorporation by reference apply to terms and conditions included on a website); *Morgantown Mach. & Hydraulics of Ohio, Inc. v. Am. Piping Prods., Inc.*, No. 5:15-cv-1310, 2016 U.S. Dist. LEXIS 21915, at *13 (N.D. Ohio Feb. 23, 2016) ("Several courts have applied traditional contract law to find terms and conditions located on a company's website to be incorporated into a contract where they were clearly referred to and could be easily located by the challenging party, especially where that party is a commercial entity"); *Burcham v. Expedia, Inc.*, No. 4:07CV1963 CDP, 2009 U.S. Dist. LEXIS 17104, at *7 (E.D. Mo. Mar. 6, 2009) ("A customer on notice of contract terms available on the internet is bound by those terms"); *Pentecostal Temple Church v. Streaming Faith, LLC*, No. 08-554, 2008 U.S. Dist. LEXIS 71878, at *14 (W.D. Pa. Sept. 16, 2008) ("Plaintiff's assertions that the [forum selection] clause should be disregarded because the Purchase Order incorporated terms and conditions only available on the Defendants'

---

in the context of contract acceptance and mutual assent.  *Id.* at 210 (quoting *Rodriguez v. United States*, 54 F.3d 41, 45 (1st Cir. 1995)).

website, and not provided in hard-copy to the Plaintiff, must also fail"); *see also Dakota Foundry, Inc. v. Tromley Indus. Holdings, Inc.*, No. 1:11-CV-01026, 2012 U.S. Dist. LEXIS 1540, at *16 (D.S.D. Jan. 5, 2012) ("With the widespread accessibility of the Internet, companies are turning to posting their general terms and conditions online and incorporating them into a physical document by reference to the Internet site where they are located.  Some courts are accepting that practice").

Given widespread access to the Internet and the ubiquity of additional terms on business websites, the Court agrees that it is appropriate to apply traditional principles of incorporation by reference where the incorporated terms appear not in a separate paper document, but on a website.  In light of this conclusion, the Court must determine whether the Peerless-Holsum contract clearly communicated that the additional terms and conditions accessible via the URL on Peerless' website, including the fee shifting provision, were intended to be a binding part of the contract.

In determining whether a provision is adequately incorporated by reference, courts look to whether the contract language referencing the additional terms includes phrasing such as "subject to," "pursuant to," "expressly limited by" or "in accordance with," or something similar, to clearly indicate that the contract includes those additional terms.  For example, in *American Specialty Lab, LLC v. GenTech Science, Inc.*, the United States District Court for the Western District of New York concluded that a paper contract with a URL directing the reader to additional terms and conditions on a website was properly incorporated by reference based on the contract language.  In that case, the parties entered into an equipment purchase

14

agreement memorialized on paper. *Am. Specialty Lab, LLC*, 2020 U.S. Dist. LEXIS 163560, at *2. Next to signature line, in text slightly smaller than the rest of the contract, was the following statement: "This order for equipment, parts, or services is expressly limited to acceptance of GenTech's General Sales Terms and Conditions. (available at http://gentechscientific.com/content/tt-sales-terms-and-conditions). Any different or additional terms are expressly rejected by GenTech unless agreed to in writing." *Id.* The disputed term could be accessed via the URL as item number thirty-four of the Terms and Conditions. *Id.*

Relying on New York state law, the district court explained that "a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it," *id.* at *8 (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996)), so long as the paper to be incorporated is "so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." *Id.* at *8-9 (quoting *Wendrovsky v. Chase Paymentech*, No. 12 CIV. 0704 (AJN), 2012 U.S. Dist. LEXIS 150866, at *3 (S.D.N.Y. Oct. 15, 2012)). The district court highlighted that "[r]eference to a website containing terms and conditions can provide proper identification." *Id.* at *9. The district court ultimately concluded that "the purchase order contains a reference to a specific website where the terms and conditions can be found" which "makes the

terms and conditions 'identifiable beyond all reasonable doubt,' and validly incorporates them by reference."[3] *Id.* at *10.

Similarly in *One Beacon Insurance Company v. Crowley Marine Services*, the Fifth Circuit concluded that a statement that "THIS RSO IS ISSUED IN ACCORDANCE WITH THE PURCHASE ORDER TERMS & CONDITIONS ON WWW.CROWLY.COM / DOCUMENTS & FORMS, UNLESS OTHERWISE AGREED TO IN WRITING" was properly incorporated into a contract by reference. 648 F.3d at 263. The Fifth Circuit concluded that the defendant's "intent to incorporate the terms and conditions [was] clear from the explicit incorporating language prominently placed on the face of the [document] in all capital letters." *Id.* at 269. The circuit court noted in particular that the website was accessible, easily navigable, and concluded "that a reasonable person would have been able to find the terms and conditions." *Id.* Addressing the larger context of the agreement, the *One*

---

[3]     The *American Specialty Lab* Court rejected the argument that it should apply a "browsewrap analysis" to the case. *Id.* at 11. The district court explained that a browsewrap is an "agreement[] involv[ing] terms and conditions accessible through a hyperlink, commonly at the bottom of the screen, [which] do not request an express manifestation of assent." *Id.* (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 223 (2d Cir. 2016)). To determine whether to enforce a browsewrap, "courts look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." *Id.* at *11-12 (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)). The district court rejected the arguments that the "'hyperlink' leading to the terms and conditions was 'hidden in the Customer Purchase Order,' that the reference to the website containing the terms and conditions was 'located in a very inconspicuous place with a smaller font which is not even readily readable,' that the terms were 'placed far below, separate and apart, from the main handwritten Order inconspicuously,' and that 'these almost invisible hyperlinked website material clauses required Plaintiff to go to the website.'" *Id.* at *12. The district court reasoned that "[t]he purchase order [was] not a website, but a paper form that [the purchaser] signed in ink" and "[t]he terms and conditions were not accessible by a 'hyperlink,' because there are no hyperlinks on paper contracts." *Id.* at *13. Instead, the district court concluded that "the purchase order conspicuously directed [the purchaser] to access the applicable terms and conditions at the website listed," which is a valid form of incorporation by reference. *Id.* In particular, the district court noted that the "web address and [reference to the terms and conditions] were located directly next to the signature line on the purchase order." *Id.*

16

*Beacon* Court noted that that the plaintiff's representative "testified that he understood the notice provision . . . and admitted that he could have accessed the terms and conditions on the website at any time." *Id.* The Fifth Circuit went on to explain that "both parties were commercial entities with sophisticated procedures in place for reviewing contracts, even if [the plaintiff] did not implement those procedures in this case." *Id.*; *see also In re Moran Phila.*, 175 F. Supp. 3d 508, 523 (E.D. Pa. 2016) (explaining that a plaintiff's receipt of a series of invoices, each containing the same statement with an accompanying URL that the document was subject to the company's terms and conditions, sufficiently incorporated additional terms by reference).

However, in *Manasher v. NECC Telecom*, No. 06-10749, 2007 U.S. Dist. LEXIS 68795 (E.D. Mich. Sept. 18, 2007), the United States District Court for the Eastern District of Michigan concluded that a statement reading: "NECC's Agreement 'Disclosure and Liabilities' can be found online at www.necc.us or you could request a copy by calling us at (800) 766 2642" did not provide adequate notice of the defendant's intent to incorporate the additional disclosures and liabilities into the contract by reference. *Id.* at *4-5, 16. The district court explained that "[t]he language [did] not betray a clear intent that the Disclosure and Liabilities Agreement be considered part of the contract between the parties" and noted that "[t]he statement merely informs the reader of where to find 'NECC's Agreement 'Disclosure and Liabilities.'" *Id.* at *15-16. The *Manasher* Court emphasized that the disclosure was "the last of five statements, written in plain text, on the second page of the

invoice." *Id.; see also Piazza v. Santander Consumer USA Inc.*, No. 19-cv-11697-ADB, 2020 U.S. Dist. LEXIS 43026, at *2, 11-12 (D. Mass. Mar. 12, 2020) (concluding that a loan agreement stating that a consumer "*may* owe [the defendant] . . . subject to applicable law (including Mass. Gen. Laws. Ch. 255B § 20B)" did not incorporate § 20B by reference because the plaintiffs could reasonably have interpreted the mention of § 20B in multiple ways) (emphasis supplied).

In this case, Peerless sent Holsum a four-page confidential proposal for a sandwiching machine on January 30, 2017. *Am. Compl.*, Attach 1, *Contract* at 1. Page four of the contract contains a provision that reads:

- Peerless warrants that it will convey the Products free and clear of all liens, security interests and encumbrances created by, through or under Peerless.  Peerless further warrants that for a period of one year from the date of delivery (the "Warranty Period"), under normal use and given proper installation and maintenance as determined by Peerless, the Products: (a) will conform to mutually agreed upon written specifications or other descriptions; and (b) will be free from substantial defects in material and workmanship

- For a complete list of our Terms & Conditions and Warranty details, please visit our website at http://www.peerlessfood.com/about-us/purchase-terms.html [4]

*Contract* at 4.  The text of the URL appears in black and is underlined.  *Id.*  At the bottom of page four, just under the warranty provision, a handwritten signature appears on the "buyer" line, dated "1-30-2017" with a "P.O # 107966" listed below the

---

[4]   The web address listed in the contract does not, as of August 9, 2022, lead to the correct page on Peerless' website.  However, that is not dispositive, as the contract was entered into in 2017 and Peerless' website may have changed.  Moreover, Holsum does not argue that the link was incorrect. This points to a different issue not present here, namely how the proponent of incorporation is going to demonstrate that a particular version of the website existed as of the date the contract was entered into, when the website was subject to periodic subsequent revision.

date. *Id.* The same signature appears in the left-hand margin of each of the previous three pages of the contract. *Id.* at 1-3. No part of the contract expressly references a fee shifting or other attorney's fees provision and it is not explicitly stated that there is such a provision as part of the Terms & Conditions accessible via the URL on page four.

The Court concludes that Peerless' contract does not "clearly communicate that the purpose of the reference [to Peerless' website] is to incorporate the [terms and conditions located on the website] into the contract." *Awuah*, 703 F.3d at 43; *see also Comite*, 170 F. Supp. 3d at 274 (applying *Awuah* in a Puerto Rico contract law case). First, the language of the agreement, which tells the reader where to find a "complete list" of Terms & Conditions, does not put a reasonable reader on notice that it – as opposed to Peerless – will be bound by those additional terms and conditions. Significantly, the website is embedded in the section of the Peerless' contract labeled "warranty," and although the provision expressly states that it is to Peerless' *complete* terms and conditions, the contract does not reasonably put the reader on notice that the terms and conditions may include other contractual provisions entirely separate from Peerless' warranty under this specific agreement.

The paragraph immediately preceding the incorporation paragraph informs the reader of the express warranties Peerless was making in selling its product to Holsum, but that paragraph does not delineate the details of the Peerless warranty. It merely highlights the length of the warranty period – one year – and the general terms of the warranty. It would have been reasonable for Holsum to have concluded

19

that the link to the website contained only the specifics of the obligations Peerless agreed to undertake in its product warranties, not the obligations Holsum was undertaking in purchasing the Peerless equipment.

This impression is buttressed by the language of the incorporation phrase: "For a complete list of *our* Terms & Conditions and Warranty details." *Contract* at 4 (emphasis supplied). Again, a reasonable reader could understand that the link described the agreements Peerless was assuming, because in using "our", it was referencing Peerless, not Holsum. While Holsum might have been interested in how Peerless would respond to a defect in the material and workmanship of the product, it would not have suspected that within Peerless' description of its duties, it was imposing a significant obligation on Holsum.

Thus, unlike the agreements in *American Specialty Lab* and *One Beacon*, Peerless' contract did not instruct Holsum that it would be bound to the additional Terms & Conditions located at Peerless' website if it signed the agreement. The contract did not explain that Holsum should *only* sign the agreement if it read and understood the additional Terms & Conditions, nor did the contract require Holsum to acknowledge the existence of the terms and conditions in any way by, for example, initialing the provision. Instead, the contract merely states that a "complete list of . . . Terms & Conditions" can be found on Peerless' website. *Compare One Beacon Ins. Co.*, 648 F.3d at 263 (stating that the agreement was issued "in accordance with the purchase order terms and conditions" on a website), *with Am. Specialty Lab, LLC,*

20

2020 U.S. Dist. LEXIS 163560, at *2 (stating that the purchase order was "expressly limited to acceptance" of the additional terms and conditions),

Indeed, the Court finds this contractual language more akin to that in *Manasher* as it simply directs Holsum to where it can find additional terms but fails to explain that Holsum will be *bound* by those additional terms. *See Greene*, 794 F.3d at 145 (explaining that a "mere[] . . . acknowledge[ment] that the referenced material is relevant to the contract" is not sufficient to incorporate extrinsic terms). Although the First Circuit has stated that "the traditional language of 'incorporating by reference'" is unnecessary and "no such magic terms are required," *see Awuah*, 703 F.3d at 43, the language of Peerless' contract provision does not "clearly communicate[] the purpose of incorporating the . . . clause," even in "general terms." *Id.; see Greene*, 794 F.3d at 145-46 (concluding that a statement that "All employees of the University are employed *pursuant to* and *subject to* the policies and the procedures of the Medical Center and the policies, rules and regulations adopted by the Board . . . as amended, revised or repealed from time to time" was a sufficiently clear incorporation of a policy) (emphasis added).

Second, visually, Peerless' contract bears some of the hallmarks that the *Manasher* Court found concerning, including the plainness of the text and the location of the incorporated text at the end of the agreement. *But see Am. Specialty Lab*, 2020 U.S. Dist. LEXIS 163560, at *12-13 (concluding that placement directly above the signature line made the referenced provision more prominent). Here, the URL and the relevant provision are the same size, font, and color as the other terms on the

page. It is true that the URL is the only underlined text in the contract, which tends to make it more prominent, and it is listed as its own bullet point. However, even if the Court was to conclude that the URL was visually prominent, Peerless has not pointed to any caselaw—and the Court has been unable to find any—suggesting that the location and visual prominence of a URL can overcome otherwise deficient language used to communicate that the terms and conditions found at the URL are incorporated to the contract.

Finally, in addition to the language of the contract and its appearance, the Court also looks to the transactional context of the agreement. As Peerless noted its motion for attorney's fees, Holsum and Peerless are both sophisticated commercial entities who have done business with each other in the past. *See UBS Fin. Servs v. XL Specialty Ins. Co.*, 929 F.3d 11, 24-25 (1st Cir. 2019) (noting that the sophistication of the parties involved may impact the court's construction of a contract and its scope). At trial, Miguel Pereira, the Holsum employee in charge of the Cameo Cookie project, testified that "the relationship between Holsum and Peerless Equipment . . . lasted for many years . . . , since prior to 1980" and that Holsum purchased "more than 100 machines" of different kinds from Peerless over the years. *Excerpt of Jury Trial Proceedings, Witness Miguel Pereira* at 7:16-8:5 (ECF No. 276) (*Mar. 29 Pereira Tr.*). Although Peerless drafted the terms of the agreement, Holsum has not presented any evidence that Holsum had no meaningful choice but to accept the contract. *See Rivera*, 575 F.3d at 21 (collecting cases and explaining that a lack of negotiation does

22

not per se make a contract provision invalid); *United States v. Berry*, No. 6-CV-211-JD, 2008 U.S. Dist. LEXIS 81137, at *17 (D.N.H. Oct. 2, 2008).

There is no evidence that Peerless told Holsum that it would "enter into the transaction only on the terms contained in the document," *Kristian v. Comcast Corp.*, 446 F.3d 25, 32 n.2 (1st Cir. 2006), and in fact, the record shows that Peerless gave Holsum a discounted rate for the sandwiching machine, which suggests that the contract was more than simply "take it or leave it." *Excerpt of Jury Trial Proceedings-Day 5, Witness Miguel Pereira* at 6:3-14 (ECF No. 278) (*Apr. 1 Pereira Tr.*). There is no evidence of negotiation over the specific terms in the contract, and this case does not involve significantly different bargaining power or other indicators of inequity in the contract formation. Although Mr. Pereira testified that he visited Peerless' website but did not read the additional terms and conditions before signing the agreement on Holsum's behalf, *see Apr. 1 Pereira Tr.* at 7:7-8:4, this does not overcome the requirement that a contract must reasonably inform a party that it will be bound by the incorporated terms. The Court concludes that, at best, the contract simply informed Mr. Pereira that he could find the terms and conditions of Peerless' warranties on Peerless' website if he chose to look for them, not that Holsum would be *bound* by those terms and conditions.

### 3. Conclusion

Because Peerless' contract states that a complete list of its terms and conditions can be found on its website but fails to put Holsum on notice that it will be bound by those additional terms and conditions, the Court concludes that the fee shifting provision is not binding on the parties. Peerless is not entitled to attorney's

fees based solely on the parties' contract, which does not in itself contain any fee shifting terms.

### B.    Puerto Rico Rule of Civil Procedure 44

The Court turns to whether Peerless is otherwise entitled to attorney's fees pursuant to the Puerto Rico Rules of Civil Procedure.

### 1.    Legal Standard

"Where, as here, the court's jurisdiction is based on diversity of the parties, a district court's award of attorneys' fees is governed by relevant state law, in this case Rule 44.1(d) of the Puerto Rico Rules of Civil Procedure." *Fazio v. James River Ins. Co.*, No. 20-1074 (MEL), 2021 U.S. Dist. LEXIS 108087, at *6 (D.P.R. June 7, 2021) (quoting *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 451 (1st Cir. 2010)).  Rule 44.1 provides:

> (d) Attorney's Fees. — In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct.

P.R. Laws Ap. tit. 32A, § III, Rule 44.1.  The Puerto Rico attorney's fee provision seeks "to impose a penalty upon a losing party that because of his stubbornness, obstinacy, rashness, and insistent frivolous attitude has forced the other party to needlessly assume the pains, costs, efforts, and inconveniences of a litigation." *Fazio*, 2021 U.S. Dist. LEXIS 108087, at *6-7 (quoting *Feliciano Rivera v. Pina Nieves*, 292 F. Supp. 3d 560, 567 (D.P.R. 2018)); *see also Suero-Algarín v. San Pablo Caguas*, No. 14-1508 (SCC), 2020 U.S. Dist. LEXIS 260963, at *3 (D.P.R. Nov. 23, 2020) (explaining that a

prevailing party is not "*carte blanche*" entitled to attorney's fees absent a finding of obstinacy or frivolity).

For a court to make a finding of obstinacy, "a litigant [must have] been 'unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby wasting time and causing the court and the other litigants unnecessary expense and delay.'" *Fazio*, 2021 U.S. Dist. LEXIS 108087, at *7 (quoting *Flovac, Inc. v. Airvac, Inc.*, No. 12-1348, 2017 U.S. Dist. LEXIS 48081, at *2 (D.P.R. Mar. 30, 2017)). "The offending party's conduct, at the very least, must have started 'a litigation that could have been avoided,' unnecessarily delayed the proceedings, or forced the other party to 'embark on needless procedures.'" *Id.* (quoting *Flovac, Inc.*, 2017 U.S. Dist. LEXIS 48081, at *2).

Courts should consider "(1) the complexity of the issues, the clarity of the law, and the disposition of the litigants[,] in short, the 'personality' of the case; (2) the delay and stubbornness in discovery, including a disregard for court orders; (3) temerity in settlement negotiations; and (4) the novelty of the claim." *Id.* (quoting *Feliciano Rivera*, 292 F. Supp. 3d at 567); *see also C-Fuels v. Puma Energy Caribe LLC*, No. 19-2057 (ADC), 2021 U.S. Dist. LEXIS 198515, at *2-3 (D.P.R. Feb. 25, 2021). "'Obstinacy is to be judged in light of the overall circumstances of the particular case,' but generally includes conduct such as 'denying all liability in answering a complaint, where the defendant later admits liability; raising inapplicable defenses; denying all liability when only the amount of damages sought is contested; and denying a fact, knowing it is true.'" *Fazio*, 2021 U.S. Dist. LEXIS

108087, at *7-8 (quoting *Inducol S.A. v. Gutierrez*, No. 12-2053, 2013 U.S. Dist. LEXIS 153044, at *8 (D.P.R. Oct. 23, 2013)).  "Essentially, a party is obstinate if it 'engages in actions which (a) make necessary litigation which could have been avoided, (b) prolongs the litigation unnecessarily, or (c) requires the other party to incur expenses in the pursuit of avoidable tasks.'"  *C-Fuels*, 2021 U.S. Dist. LEXIS 198515, at *3 (quoting *Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.*, 20 F.3d 15, 24 (1st Cir. 1994)).

"Under Puerto Rico law, attorneys' fees are not meant to compensate a litigant for the total costs incurred in the law suit," *IOM Corp.*, 627 F.3d at 452, but instead "must be commensurate to that amount which, in the opinion of the court, reasonably represents the value of th[e] [legal] services, considering the degree of obstinacy [or frivolousness] and other circumstances of the case."  *Id.* (quoting *Asociación de Condóminos v. Trelles Reyes*, 20 P.R. Offic. Trans. 599, 605, 120 P.R. Dec. 574, 1988 Juris P.R. 25 (1988)); *see also C-Fuels*, 2021 U.S. Dist. LEXIS 198515, at *4 ("It is well settled that '[t]he Puerto Rico rule on obstinacy was not designed as a premium to successful litigants, but rather as a penalty to be imposed on those litigants whose conduct in pursuing a course of action borders on unreasonable pertinaciousness'" (quoting *Reyes v. Banco Santander de P.R., N.A.*, 583 F. Supp. 1444, 1446 (D.P.R. 1994))).

### 2.    Analysis

Regarding the "personality" of the case, contrary to Peerless' contentions, while presiding over this trial, the Court found that the parties presented a case ideal for jury resolution.   The facts, though complicated, were well within common

understanding, the witnesses were well-spoken with good recollections of the events, the law was reasonably straightforward, and each party was represented by extremely able, effective, and experienced attorneys.  In short, the Court viewed the lawsuit itself and the inability of the parties to resolve it to be a function of the parties' substantially differing perspectives of the contested facts and the ultimate resolution of the dispute by a civil jury was what the federal courts are constitutionally designed to provide.

Although the legal theories of breach of contract and negligence were fairly straightforward, the case presented a complex factual web that was difficult to untangle prior to all three parties presenting their cases to the ultimate finder of fact. The conduct in this case bears no hallmarks of unreasonably adamant litigation incurring unnecessary expenses and prolonging the disposition of the case, but rather, typical long-running litigation between zealously represented parties.  *See Suero-Algarín*, 2020 U.S. Dist. LEXIS 26093, at *5-6 (explaining that "parties engag[ing] in a tooth and nail battle which dates back [six years]" does not justify departure "from the well-established principle that each party must bear their own attorney's fees" absent more specific evidence of frivolousness or obstinacy).  The Court found all parties to be diligent in their representation and the record is devoid of evidence that Holsum unnecessarily engage in untoward tactics.  *See Bermudez v. Berrios*, No. 15-1034 (CVR), 2020 U.S. Dist. LEXIS 61160, at *5 (D.P.R. Apr. 6, 2020) (denying a plaintiff's motion for attorney's fees for a "relatively straightforward case" where "[t]here was no needless prolongation of the litigation or a misuse of time" and

where "the Court [found] that both parties worked diligently in prosecuting their respective cases and both had experts and witnesses prepared for trial").

Still, Peerless argues that it is entitled to reasonable attorney's fees under Rule 44.1 because Holsum acted obstinately when it (1) "filed an Amended Complaint adding Peerless as a defendant based on the mere allegations in Compass's Answer" "[e]ven though Peerless' cookie sandwiching machine had been operating and producing saleable cookies for Holsum since November 2017," *Peerless' Mot.* at 4, and that the "complaint allegations against [it] were insufficient, considering the contractual relationship between Holsum and Peerless," *Id.* at 8; and (2) "Holsum had many opportunities to settle its claims against Peerless and refused to do so." *Id.* at 10.

Taking each allegation in turn, the Court concludes that Holsum did not act obstinately and that Peerless has failed to alleged conduct that would justify deviating from the general rule that each party should bear its own litigation costs. *See Dopp v. Pritzker*, 38 F.3d 1239, 1254 (1st Cir. 1994) ("[E]ven if a party's claim ultimately fails, it cannot be deemed frivolous or obstinate for that reason alone").

### a.   Whether Holsum Acted Obstinately in Filing Breach of Contract and Negligence Claims Against Peerless

Regarding Holsum's breach of contract claim, Peerless argues that "[t]he terms of that contract were clear . . . , Holsum tendered payment to Peerless in the amount agreed between the parties.  Peerless fully and timely complied with its contractual requirements . . . [and] [t]he sandwiching machine was able and capable of undertaking the Cameo cookie project, allowing Holsum to supply acceptable,

28

saleable Cameo cookies to Mondelez by late November 2017, on time to serve the first order placed by Mondelez." *Peerless' Mot.* at 7.  Holsum, in turn, argues that the case was "close" because "Mr. Switzer . . . admitted he had wrongly assumed the Canada and Holsum products were the same size" and "[a]s a result . . . Peerless had to redesign (due to its own fault) 'the machine's key components' while in Puerto Rico." *Holsum's Opp'n* at 7-8.

The Court agrees that Holsum did not act obstinately in amending its complaint to bring claims against Peerless for breach of contract and negligence and that the jury could have reasonably found in favor of Holsum on its claims.  The fact that the Peerless machine was delivering saleable, sandwiched cookies by November 2017 does not change the Court's conclusion that there were disputed material facts as to the proper execution of the parties' contract obligations that were legitimately contested up to the point at which the parties rested their cases before the jury.

First, one of the primary disputes between Holsum and Peerless was over the adequacy of the machine's initial design with respect to the size of the cookies and whether Peerless had to later modify the machine because it improperly relied on the wrong size cookie, or because Holsum's cookies were, at that time, inadequately made.  In particular, there was a question for the jury as to whether it was proper for Peerless to have relied on the dimensions of Canadian-produced Cameo Cookies in designing the sandwiching machine.  In his testimony, Jason Switzer, Peerless' expert, testified that "[t]he driving question [in designing a sandwiching machine] is what's the size shape dimensions" because "[i]f you do not have the right size of

product for the machine, then the machine will not process it." *Holsum's Opp'n*, Attach. 1, *Excerpt of Jury Trial Proceedings, Witness Jason Switzer* at 23:3-8 (*Switzer Tr.*).   The Peerless-Holsum contract explains that the "customer [will] provide information on shape and size of [the cookie] shells for [Peerless'] evaluation," *Contract* at 4, which Mr. Pereira explained Holsum complied with when it provided Peerless a rotary dye drawing of the cookies.   *See Apr. 1 Pereira Tr.* at 10:19-20 ("A. Peerless was provided the necessary information.   Q.   The information that you considered necessary?   A. Correct").   However, Mr. Switzer stated that a rotary dye drawing is "not really a complete picture of what the product is" and that because cookies spread or shrink when baked "the product size is, often times, not going to be what your rotary dye drawing is." *Switzer Tr.* at 24:15-22.

Mr. Switzer subsequently explained that because he felt "[t]hat Holsum did not provide Peerless the full specifications on the Cameo Sandwich Cookie," *id.* at 57:12-22, he purchased Canadian-produced Cameo cookies, measured the length, width, and thickness of the product, and used those measurements to inform the design of sandwiching machine.   *Id.* at 24:23-25:11.   He further elaborated that he felt the dimensions of the Canadian-produced Cameo cookie made for "a safe assumption because Mondelez is very specific" and demanded "quality and consistency," *id.* at 25:14-16, but admitted on cross-examination that "Holsum [did not] instruct[] Peerless to go and get Cameo cookies from Canada" nor did "the engineering team at Peerless . . . contact Holsum to ask for product." *Id.* at 78:19-25.

Mr. Switzer went on to testify that upon installation of the sandwiching machine in Holsum's factory, "[t]he product would continually jam in the machines" and the Cameo cookie cake bases "were typically quite a bit higher than 68 millimeters which is what [he] was originally expecting," *id.* at 59:3-13, and that the product was often "incorrect and inconsistent" because it was "more brittle, more prone to cracking[,] . . . [or] softer, like, it absorbed quite a bit of moisture." *Id.* at 58:4-15. Based on Mr. Pereira and Mr. Switzer's testimony there was an initial question as to whether Holsum met its obligation under the contract to "provide information on shape and size of [the cookie] shells for [Peerless'] evaluation," *Contract* at 4, and whether, in light of the jury's conclusion on that issue, Peerless acted reasonably in relying on the Canadian-produced Cameo Cookie dimensions in designing the machine or unreasonably by not asking Holsum for additional information if it felt the rotary dye it provided was inadequate.

In light of the machine's difficulties, Peerless "design[ed] new parts that would help product . . . run a little bit easier," *id.* at 64:21-22, which Mr. Switzer testified was done pursuant to the contract warranty. *Id.* at 65:6-8. Mr. Switzer explained that "it's not common" to have to change and redesign a lot of parts in the "installation and commissioning of a sandwiching machine" and went on to confirm that it is "[e]ven less common" to "be confronted with base cakes that did not meet the specifications" and "to have product that was of this consistency during the early days." *Id.* at 75:17-76:9. It was therefore reasonable to ask the jury to resolve whether Peerless had to redesign the machine because it initially improperly relied

on incorrect measurements and failed to obtain additional information directly from Holsum, or whether the machine's issues stemmed from Holsum's inconsistent product, which Peerless had to accommodate for the machine to run.

Mr. Switzer testified that the alterations were done pursuant to Peerless' warranty, but the jury could have made several discrete findings relating to Peerless' warranty. The first is that the jury could have reasonably concluded that the warranty provision did not apply. On cross-examination Mr. Pereira explained that on May 12, 2018, he formally accepted the Peerless sandwiching machine subject to receipt of an updated machine Operation Manual, which Peerless subsequently delivered to Holsum. *Apr. 1 Pereira Tr.* at 36:19-37:4, 17-19. Page fourteen of the manual includes the Peerless Food Equipment Warranty, which states:

> There are no warranties expressed or implied including a warranty of merchantability or fitness for a particular purpose which extend beyond those set forth herein. . . . The liability of Peerless shall be limited to the repair or replacement of any defective equipment which repair or replacement shall be the buyer's sole and exclusive remedy. . . [and] Peerless shall not be liable for loss of profits, incidental or consequential damages or failure of the equipment to comply with any federal, state or local laws. . . . Peerless shall, under no circumstances, be liable for the cost of raw materials used or lost in testing or experimental operations of any equipment sold, whether such testing or experimentation is completed under the supervision of a representative of Peerless or of an employee or other representative of the buyer.

*Id.* at 42:4-43:2. Peerless argued that this provision was the basis for its contention that all changes made to the sandwiching machine were done pursuant to the warranty. However, the initial contract Holsum signed on January 30, 2017, did not include this full warranty language. Based on the Court's analysis of the fee shifting provision contained on Peerless' website, though not compelled to do so, a jury could

have concluded that Holsum did not have reasonable notice of the full warranty provision when it signed the contract on January 30, 2017.  Although Holsum later received a hard copy of the warranty provision in the Operation Manual, as Mr. Pereira testified, Holsum did not receive this until after May 12, 2018.  Based on when Holsum received the Operation Manual, whether the warranty applied was properly before the jury as an issue for resolution at trial.

Second, the jury could alternatively have concluded that even if the warranty provision applied, the alterations Peerless made to the machine were so significant, and so substantial, that they fell outside the scope of the basic warranty provision which was limited to the "repair or replacement of any defective equipment."  *See also Switzer Tr.* at 48:14-20 (explaining that Peerless had to redesign the side frame plates which are "the bones of the machine, the chassis if you will").

Finally, there was also a triable issue as to whether Peerless breached its contract with Holsum by failing to deliver a fully functioning sandwiching machine by September 2017.  Mr. Pereira testified that he communicated to both Compass and Peerless that the machines should be delivered to Holsum by August 15 so that installation and commissioning could be completed by September 15.  *Apr. 1 Pereira Tr.* at 44:12-17.  However, because the machines were not operational by September, Holsum was "unable to comply with Mondelez and had to postpone the [Cameo Cookie production] date" until the "first week of December 2017," "three months after the date" originally communicated to Peerless and Compass, although Holsum never breached its contract with Mondelez.  *Id.* at 45:1-14.  As of December 2017, however,

Mondelez was satisfied with the Holsum Cameo cookies and Mr. Pereira testified that "[t]o this day, [Holsum has] received no complaint from Mondelez of anything having to do with the product," *id.* at 33:14-18. *See id.* at 35:25-36:7. Based on the record, it was an issue for the jury to determine whether Peerless breached its contract with Holsum by not providing an operating machine by September 2017 though it never caused Holsum to breach its contract with Mondelez.

Ultimately, because the jury could have concluded that Peerless breached its contract with Holsum, Holsum did not act obstinately in amending its complaint to bring a claim against Peerless because there were material issues of fact to be resolved by a factfinder. Based on the evidence a jury could have concluded that Peerless breached its contract by (1) improperly designing the sandwiching machine based on measurements not provided or confirmed by Holsum, which subsequently required a comprehensive overhaul of the machine; and/or (2) by failing to meet the agreed-upon deadline for installation and commissioning of a properly functioning machine. In sum, the Court cannot conclude that Holsum acted obstinately by bringing a breach of contract claim against Peerless because it could have prevailed at trial on its contract claims.

As to its negligence claim, Holsum's allegations against Peerless are thinner, but that does not rise to the level of obstinacy required for attorney's fees. *See Dopp*, 38 F.3d at 254 ("[A]s a general rule, litigation of a novel but colorable claim cannot, by itself, provide the basis for a finding of obstinacy under P.R.R. Civ. P. 44"). As Peerless explains, "Puerto Rico's general tort statute[] generally does not apply in the

context of commercial transactions." *Linares-Acevedo v. Acevedo*, 38 F. Supp. 3d 222, 228 (D.P.R. 2014).  Nonetheless "[a] plaintiff may bring a negligence claim based on a contractual relationship when there is both an alleged breach of contract *and* an alleged breach of the general duty not to negligently cause injury.  This general duty not to act negligently must arise out of conditions separate from the parties' contract." *Id.* (quoting *Nieves Domenech v. Dymax Corp.*, 952 F. Supp. 57, 65-66 (D.P.R. 1996)).

In its obstinacy argument, Peerless contends that "Holsum's allegations about negligence merely mirror its allegations of a breach of the contract with Peerless" and that, as a result, "Holsum's negligence allegations do not arise out of any conditions separate from the parties' contract." *Peerless' Mot.* at 9.  Although "the contract between Holsum and Compass did not require Peerless to coordinate or confirm the ability of the sandwiching machine to connect to the tray loader" and despite the fact that "Peerless disclaims any responsibility for the integration of the two machines," *id.* at 9-10, Holsum did not act obstinately in bringing its negligence claim because the jury could have concluded that Peerless owed Holsum a duty to act reasonably in recommending a tray loader to Holsum and in assisting Holsum in connecting the sandwiching machine to the tray loader.

At trial, Mr. Pereira confirmed that the contract "did not request Peerless to do an integration of the sandwiching machine with any tray loader," *Apr. 1 Pereira Tr.* at 8:5-8, thus, the parties agreed that connecting the two machines was not a *contractual* duty written into either of the contracts.  *See Switzer Tr.* at 60:19-21 ("Peerless was not contracted by Holsum, or anyone else, how to conduct the

integration of the equipment into the production line").  However, other testimony on the record suggests that Holsum believed that Peerless was going to assist in connecting the machines and that Peerless was aware of this belief.  Mr. Switzer testified to the following:

> Q.  You're aware that Miguel Pereira had expressed that [Holsum] thought Peerless was the leader or should be the leader, right?
> A.  He mentioned that to [Peerless salesperson] Ankush, yes.
> Q.  There is no contract that describes that relationship between Peerless and Holsum, is there?
> A.  There is not.

*Switzer Tr.* at 83:14-20; *see also Jury Trial Proceedings – Day 4* at 6:12-19 (*Mar. 31, Pereira Tr.*) ("Q.  Did you [Mr. Pereira] testify earlier that you relied on Peerless to [coordinate implementation of these two machines]?  A.  That's right.  That's part of my job, to talk to experts, for experts to tell me who I should obtain the tray loader, through what supplier.  Also, I built all the production line and made the cookies.  All the cookies that were to go through there, that all required the coordination of an expert"); *id.* at 8:3-9 ("You explain to the supplier what it is that you want to do.  You ask around in the industry who the leaders are in what you do.  Usually, that is already known, who the leaders are, and you assign the leader to be your guide and the leader teaches you, gives you recommendations, and uses its partners to help and you incorporate them into your group and you use your experience"); *id.* at 9:6-8 ("Q. The expert you relied on in incorporating these lines, it sounds like it was Peerless, is that correct?  A.  Yes and the exact same thing has been done since 1981").

Mr. Switzer confirmed that Peerless was aware that Holsum may have expected Peerless to act in a supervisory capacity to oversee integration of the two

machines. A jury could have therefore concluded that Peerless had a duty to Holsum outside of its contractual duty to provide the machine itself to assist in the integration of the machines, or at least clarify its role in the project with Holsum.

Similarly, Mr. Pereira confirmed that the Peerless-Holsum contract had "no mention that the machine needed to go to Georgia" but explained that Peerless had agreed to send the machine to Georgia to Compass' facility for coupling and testing. *Apr. 1, 2022, Tr.* at 19:4-16; *see Switzer Tr.* at 102:11-15. Mr. Switzer, however, also testified that "[n]o one from Peerless was asked to go" to Compass' facility in Georgia and "[n]o one from Peerless went." *Switzer Tr.* at 61:5-9. Based on this testimony, although the pre-delivery coupling of the Peerless and Compass machines was not a contractual obligation, the jury could infer that Peerless owed a duty to Holsum to assist in that process and find that it breached that duty in failing to send Peerless employees to assist or to otherwise ensure that the machines were working together as planned.

Although the jury concluded that there was no duty and/or breach, it could have concluded otherwise and Holsum's claim was not so farfetched, so extreme, or so unreasonable as to justify granting attorney's fees. Attorney's fees are meant to penalize a party for pernicious litigation tactics, not for bringing legal claims that do not ultimately prevail at trial. It is not uncommon for parties to a disputed contract to include a tort-based claim, such as negligence, in the event the jury were to conclude for some reason that the contract was unenforceable. The cautious lawyer often pleads theories in the alternative and the fact that one theory is more

compelling than another does not necessarily mean that the less convincing theory was frivolous or pressed obstinately.

Furthermore, even accepting the argument that Holsum's negligence claim was more difficult to prove, Peerless has not demonstrated that it incurred unnecessary expenses or had to engage in avoidable tasks to defend against Holsum's negligence claim.  In fact, based on the trial record, Peerless was able to defend against the negligence claim using the same testimony and discovery that it used to defend against Holsum's contract claim.  Here there are simply no extreme inconveniences or incurred expenses that justify penalizing Holsum for how it litigated this case.

### b.    Whether Holsum Acted Obstinately in Refusing to Settle its Claims Against Peerless

In its motion for attorney's fees, Peerless explains that the parties held formal settlement conferences on August 26, 2019, September 5, 2019, and March 17, 2022, an informal discussion on February 10, 2021, and a mediation with a court-appointed mediator but that "Holsum's position at each stage of settlement attempts was consistently disinterested in reaching a settlement without forcing Peerless to try the case." *Peerless' Mot.* at 10-11.  Although the parties engaged in multiple settlement conferences and failed to come to an agreement that would preclude trial, Peerless fails to allege "temerity in settlement negotiations" that would justify a finding of obstinacy necessary for the award of attorney's fees.  *See Inducol S.A.*, 2013 U.S. Dist. LEXIS 153044, at *8-9 ("The record also shows that Gutierrez has engaged in settlement discussions with Inducol but the parties have been unable to reach a

mutually agreeable payment plan. . . . Gutierrez's conduct cannot be said to be 'unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation,' where he has consistently admitted to some liability but disputed the exact amount of damages, and there remains a genuine issue of material fact as to three of the seven invoices in question").

It is well within a party's rights to decide that a settlement agreement is not advantageous to it and to take advantage of its right to a trial by jury.  The Court finds it particularly true in a case such as this where the disputes are primarily factual, rather than legal.  In such circumstances, it is not obstinate, unreasonable, or frivolous for a party to decide that it is in its best interest to plead its case to a jury. Moreover, Peerless has not alleged that Holsum reneged on any settlement agreements, engaged in deceitful conduct during negotiations, or engaged in any other unsavory settlement tactics beyond simply not settling the case.  *See Gómez v. Rodríguez-Wilson,* 819 F.3d 18, 25 (1st Cir. 2016) (concluding that attorney's fees were appropriate where a party "(1) reneged on his agreement to settle and nullified the initial settlement agreement as to all parties; (2) failed to comply with the settlement agreement during the twenty-day extension of time he requested; (3) failed to comply with the settlement agreement during the district court's additional extension of time; and (4) failed to appear before the district court for a final settlement conference" because this "behavior stubbornly prolonged the life of th[e] dispute, caus[ed] [the opposing party] the inconvenience and expense of continuing to

trial after reaching a settlement . . . [and] "victimized the settling parties . . . by forcing them to continue the litigation and enter into a second settlement").

### c.    The Parties' Other Arguments

As to the parties' other arguments, Holsum submits that Peerless' request for attorney's fees is "devoid of any reasonableness --- particularly coming from a party whose discovery tactics were dilatory, costly and frivolous." *Holsum's Opp'n* at 10. Holsum has not pointed to any caselaw supporting the contention, that, even assuming a party proved obstinacy, it would not be entitled to attorney's fees because of its own obstinate conduct.  To the extent that Holsum is arguing that Peerless itself acted obstinately, its arguments fail based on the record.  Holsum points to Peerless' February 12, 2021, motion to compel as evidence of frivolousness, *ITW Food Equipment Group's Mot. to Compel* (ECF No. 125), which was filed after the applicable discovery deadline.  However, as Peerless points out, Peerless raised concerns about certain missing documents at the pretrial conference on February 5, 2021, and was granted leave of the Court to file this motion to compel.  *Scheduling Order* at 1 (ECF No. 116).  Given the importance of the size of the cookies, as demonstrated by the testimony included in this Order, and in light of the Court's granting Peerless permission to file the motion to compel Holsum to produce documents related to its relationship with Mondelez, Peerless' actions appear well within the bounds of reasonable litigation efforts.

Finally, to the extent that the parties dispute whether Peerless ended up in the litigation because Compass placed responsibility on Peerless in its answer, the Court does not weigh this as a factor in its analysis.  Regardless of whether Compass

placed the blame on Peerless, Holsum, not Compass, made the strategic decision to amend its complaint to include claims against Peerless, and as the Court has explained, its decision to do so was not obstinate or frivolous. *Contra Renaissance Mktg., Inc. v. Monitronics Int'l, Inc.*, 673 F. Supp. 2d 79, 84 (D.P.R. 2009) (explaining that fraudulently joining two additional parties for the sole purpose of defeating diversity jurisdiction is grounds for the award of attorney's fees).

## IV.   CONCLUSION

The Court DENIES ITW Food Equipment Group LLC D/B/A Peerless Food Equipment's Motion for Attorneys' Fees and Expenses (ECF No. 270) and ITW Food Equipment Group LLC D/B/A Peerless Food Equipment's Motion Submitting Exhibit B to Declaration in Support of Motion for Attorney's Fees and Expenses for Restricted Viewing Under Standing Order No. 9 (ECF No. 272).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of August, 2022