UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| HOLSUM DE PUERTO RICO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:18-cv-02004-JAW |
| | ) | |
| COMPASS INDUSTRIAL GROUP | ) | |
| LLC; ILLINOIS TOOL WORKS, INC.; | ) | |
| ITW FOOD EQUIPMENT GROUP | ) | |
| LLC d/b/a PEERLESS FOOD | ) | |
| EQUIPMENT; INSURANCE | ) | |
| COMPANY ABC; INSURANCE | ) | |
| COMPANY DEF; INSURANCE | ) | |
| COMPANY XYZ, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON COMPASS' POST-TRIAL MOTIONS

Following a two-week trial a party against whom the jury rendered a verdict brings a Rule 50(b) motion for judgment as a matter of law, a motion for a new trial, and a motion for remittitur in the alternative. The Court concludes that the jury's verdict was reasonable and supported by the evidence such that judgment as a matter of law is inappropriate; the verdict does not result in a miscarriage of justice warranting a new trial; and remittitur is not proper because the damages awarded are not shocking, nor does the award suggest bias or improper motive on the part of the jury. The Court denies all three post-trial motions.

## I.    PROCEDURAL BACKGROUND

On December 26, 2018, Holsum de Puerto Rico, Inc. (Holsum) filed a two-count complaint against Compass Industrial Group, LLC (Compass) alleging breach of

contract and negligence. *Compl.* at 6-7 (ECF No. 1). On April 2, 2019, Compass answered the Complaint and filed a breach of contract counterclaim against Holsum. *Answer to Compl. and Counterclaim* (ECF No. 18) (*Compass' Answer*). On May 13, 2019, Holsum filed an Amended Complaint adding ITW Food Equipment Group LLC d/b/a Peerless Food Equipment (Peerless) as a defendant and alleging breach of contract and negligence. *Am. Compl.* at 9-10 (ECF No. 36).

From March 28 to April 8, 2022, this Court presided over a jury trial to resolve Holsum's breach of contract and negligence claims against Compass and Peerless, and Compass' breach of contract counterclaim against Holsum. *See Order* (ECF No. 241). After two weeks of evidentiary presentations, the jury found: (1) in favor of Holsum, against Compass, in the amount of $518,295.00 on Holsum's claims for breach of contract and/or negligence; (2) in favor of Peerless on Holsum's claims; and (3) in favor of Compass against Holsum in the amount of $151,217.40 on Compass' breach of contract counterclaim. *Jury Verdict Form* (ECF No. 260) (*Verdict*); *J.* (ECF No. 266) (*J.*).

On May 6, 2022, Compass filed a motion for a new trial pursuant to Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure, and for remittitur in the alternative. *Mot. for New Trial Under F.R.C.P 59 (a)(1)(A) or in the Alternative Requesting Remittitur* (ECF No. 288) (*Compass' Mot. for New Trial*). That same day, Compass also filed a motion for judgment as a matter of law. *Mot. for J. as a Matter of Law Against Holsum* (ECF No. 289) (*Compass' Mot. for JMOL*). On June 27, 2022, Holsum filed an opposition in response to both of Compass' post-trial motions. *Opp'n*

*to Compass Industrial Group, LLC's ("Compass") "Mot. for New Trial Under F.R.C.P. 59(a)(1)(A) or in the Alternative Requesting Remittitur" (DKT. No. 288) and "Mot. for J. as a Matter of Law Against Holsum" (DKT. No. 289)* (ECF No. 312) (*Holsum's Opp'n*).  On July 12, 2022, Compass replied to Holsum's opposition to both of its post-trial motions.  *Reply Br. in Supp. of Compass Industrial Group's Mot. for New Trial and its Mot. for J. as a Matter of Law* (ECF No. 313) (*Compass' Reply*).  On July 22, 2022, with leave of the Court, Holsum filed a sur-reply explaining that "Holsum's Motion in Opposition speaks for itself and requires no supplemental argumentation." *Surreply to "Reply Br. in Supp. of Compass Industrial Group's Mot. for New Trial and its Mot. for J. as a Matter of Law" (Docket No. 313)* at 2 (ECF No. 316).

## II.    MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.    The Parties' Positions

#### 1.    Compass' Motion

Compass argues that it is entitled to judgment as a matter of law for two reasons: "first, Puerto Rico's general tort statute does not apply in commercial transactions such as the one at issue," and "[s]econd, [Holsum] failed to present evidence of a breach of any duty other than contract or damages arising from any source but through its contract." *Compass Mot. for JMOL* at 2.  It says that Holsum's alleged losses "are purely economic" and "there was no evidence at all presented by Holsum of damages to person or property" and that the "alleged damages arise exclusively from the alleged conduct that is the basis for Holsum's breach of contract claim." *Id.*

3

Compass submits that the Court's instructions to the jury "accurately reflect[ed] the controlling law," but under this standard, "Holsum's negligence claim is barred" because "it was determined that there was no separate non-contractual duty and thus claimants could not assert a negligence claim." *Id.* at 4-6. It says that "the duty allegedly breached by Compass is purely contractual and is intertwined with the alleged breach of contract" and that "[t]he evidence presented at trial confirmed that the alleged damages arose from the same conduct that Holsum contended formed the basis for its breach of contract claim . . . —Compass' duty to perform under the contract." *Id.* at 6. In support of its argument, Compass cites *Ahmad Hamdallah v. CPC Carolina PR, LLC*, 556 F. Supp. 3d 34 (D.P.R. 2021), and *Burk v. Paulen*, 100 F. Supp. 3d 126, 136 (D.P.R. 2015), as cases where courts did not find a viable negligence claim because the plaintiff failed to allege a duty separate from the contractual duty. *Id.* at 6-7.

Compass next argues that "Holsum did not provide sufficient evidence of a breach of duty in contract or sufficient evidence of either a breach of a general duty or of damages arising from negligence." *Id.* at 7. It says that "[t]he uncontroverted evidence is that Holsum solely made the decision to remove the tray loader—Compass played no role in that decision" and that, moreover, "Holsum's contract defenses were largely the same as its contract *claims*." *Id.* at 8 (emphasis in original). It points to the fact that the jury "in deciding that Holsum owes the last 10% of the price for fabricating the tray loader . . . rejected Holsum's argument that the tray loader's defects should relieve it of any further obligation to pay." *Id.* Compass explains that

by "deciding that Holsum owes 100% of the service invoices," the jury rejected "Holsum's argument that the failure to successfully integrate the tray loader into the production line was Compass'[] fault." *Id.*

Compass concludes by explaining that "Puerto Rico adheres to the doctrine of *Exceptio Non Adimpleti Contractus*" and that the only issue is whether Compass owed Holsum a general duty, outside of the contract, that it breached. *Id.* at 8-9. Compass contends that it did not because Holsum's "*only* evidence at trial was that it sought the recovery of the same amount . . . that it sought [for] *contract* damages." *Id.* at 9 (emphasis in original).

### 2.     Holsum's Opposition

With respect to Compass' motion for judgment as a matter of law, Holsum points to Question I, Section I of the jury verdict form, *see Jury Verdict Form* (ECF No. 260) (*Verdict*), which reads "Has Holsum de Puerto Rico, Inc. (Holsum) proved by a preponderance of the evidence that [Compass] breached its contract with Holsum **and/or** that Compass acted negligently?," as evidence that Compass merely speculates that "Holsum's award necessarily arises from its negligence claim" and that Compass' "award corresponds to the final 10% due on the tray loader and 100% due [of] the service invoices." *Holsum's Opp'n* at 7 (emphasis in original). Holsum contends that "[t]he jury did not award 100% of what Compass claimed under its Counterclaim, nor did they itemize their award to Compass" and that, as such, Compass' arguments are speculative at best. *Id.* at 7-8.

### 3.    Compass' Reply

In reply, Compass contends that Holsum's opposition is inadequate: "(1) by failing to address issues raised by Compass; (2) by failing to appreciate the issue of party admissions and (3) by misapplying the various standards to the facts of this case." *Compass' Reply* at 1-2.  Compass says that Holsum correctly cited the United States Supreme Court Case *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Limited*, 369 U.S. 355 (1962), which states that "[w]here there is a view of the case that makes the jury's answers to specific interrogatories consistent, they must be resolved that way." *Id.* at 2 (emphasis omitted).  However, according to Compass "[t]here is but one *consistent* way to view this case: that the jury found for Compass on its contract claim, and Holsum on its negligence claim." *Id.* (emphasis in original).

Compass further rejects Holsum's argument that it "can only speculate as to the jury's reasoning concerning its award" because Compass' final invoice for 10% of the tray loader and the three service invoices amounted to $151,271.40, the total sum awarded by the jury to Compass.  *Id.* at 3.  Compass argues that "Holsum notably fails to suggest a more reasonable alternative calculation that is consistent with the evidence submitted" and that the "most reasonable, consistent interpretation is that the jury's award to Holsum has its basis in negligence, not contract." *Id.*

As to the substance of Holsum's negligence claim, Compass argues that Holsum "provides no citations from the trial demonstrating evidence supporting a separate, independent tort claim." *Id.* at 4.  It further reiterates that "Holsum does not and *never* has specified what specific actions of Compass constituted a breach of duty in tort separate from the alleged breach of contract" and submits that Holsum

6

makes vague references to "views of the case" that make the jury's verdict consistent but fails to explain what those views are. *Id.* (emphasis in original).

### B. Legal Standard

Federal Rule of Civil Procedure 50 allows a party to make a motion at trial alleging that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50 (a)(1). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a)" the movant may, "[n]o later than 28 days after the entry of judgment . . . file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b). "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." FED. R. CIV. P. 50(b)(1)-(3).

In resolving a renewed motion for judgment as a matter of law, the Court is required to "view the evidence 'in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.'" *McMillan v. Mass. Soc. for the Prevention of Cruelty to Animals*, 140 F.3d 288, 299 (1st Cir. 1998) (quoting *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 (1st Cir. 1997)). The Court's analysis is "weighted toward preservation of the jury verdict" and the Court will uphold the verdict "unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] . . . that no reasonable jury could have returned [it]." *Rodowicz v. Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 41-42 (1st Cir. 2002) (internal quotation marks and citation omitted). In its analysis, the Court "may not consider the credibility of

witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence."
*Mesías v. Hosp. Hima San Pablo*, No. 18-1988 (JAG), 2021 U.S. Dist. LEXIS 57090,
at *3 (D.P.R. Mar. 24, 2021) (internal quotation marks and citation omitted); *see also*
*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

### C.    Discussion

Compass renews its Rule 50(a) argument that no reasonable jury could
conclude that it acted negligently in its dealings with Holsum.  The Court disagrees
and denies Compass' renewed motion for judgment as a matter of law because: (1) the
doctrine of *Exceptio Non Adimpleti Contractus* does not always apply under Puerto
Rico law and there is a reasonable view of the case that allows both parties to recover
in contract without being "overwhelmingly inconsistent"; (2) Compass failed to
request a jury instruction on this doctrine, did not object to the instructions as given
without an *Exceptio Non Adimpleti Contractus* instruction, and therefore waived the
argument that the jury should have resolved the case on the ground of a legal concept
never presented to the jury; and (3) even assuming the doctrine did apply, the jury
could have reasonably concluded that Compass acted negligently.

### 1.    Breach of Contract and Inconsistent Verdicts

31 L.P.R.A. § 3017 of the Puerto Rico Civil Code provides that "[i]n mutual
obligations none of the persons bound shall incur default if the other does not fulfill
or does not submit to properly fulfill what is incumbent upon him," 31 L.P.R.A. §
3017, which this District has described as "implicitly includ[ing] the doctrine of
*exceptio non adimpleti contractus*."  *Parker Waichman LLP v. Salas LC*, 263 F. Supp.
3d 369, 374 (D.P.R. 2017) (citing *FDIC v. Empresas Cerromonte Corp.*, No. 10-1623,

2013 U.S. Dist. LEXIS 138794, at *15 (D.P.R. May 29, 2013)); *see also Casco, Inc. v. John Deere Constr. & Forestry Co.*, No. 13-1325 (PAD), 2017 U.S. Dist. LEXIS 54045, at *18 (D.P.R. Mar. 30, 2017) ("[P]ursuant to [the doctrine of *exceptio non adimpleti contractus*], once a party fails to fulfill its obligations under the contract, the other party is no longer bound to comply with its own obligations under Article 1077"). Simply put, "[u]nder this doctrine, 'the plaintiff may not sue if the plaintiff's own obligations have not been performed.'" *Parker Waichman*, 263 F. Supp. 3d at 374 (quoting Black's Law Dictionary, 682 (10th ed. 2014)).

However, Puerto Rico law recognizes that "not every breach of a contractual obligation gives rise to such a defense, for it is necessary that both obligations be truly reciprocal." *Casco*, 2017 U.S. Dist. LEXIS 54045, at *18-19. A "reciprocal obligation" occurs in a bilateral contract where "there are obligations and correlative obligations [that are] so interdependent between themselves that one is a consequence of the other, and the performance of said obligation by a contracting party constitutes the motive of the contract for the other party, and vice versa." *Waterproofing Sys. v. Hydro-Stop, Inc.*, No. 04-2218 (CCC-CVR), 2006 U.S. Dist. LEXIS 98605, at *37 (D.P.R. June 2, 2006) (alterations in *Waterproofing Sys.*) (quoting *Ponce v. Vidal*, 65 P.R.R. 346, 351, 65 P.R. Dec. 370 (1945)); *see also Dopp v. Pritzker*, 38 F.3d 1239, 1243 (1st Cir. 1994) (describing reciprocity as "exhibit[ing] *both* mutuality *and* essentiality—what one might term 'mutual essentiality'") (emphasis in original). This "narrow" interpretation of reciprocity serves the "higher interest" of "promot[ing] the fulfillment of contracts" and ensuring that "by a lesser breach of contract, one of

9

the parties [does not] release himself from the obligation, either because he is no longer interested or because the contract does not suit him anymore." *Dopp*, 38 F.3d at 1246 (quoting *Ramirez v. Club Cala de Palmas*, 89 J.T.S. 22 (1989)). The First Circuit has characterized Article 1077 as "a remedy of last resort, reserved for situations in which a party's breach dissipates the very essence of a contract." *Id.* at 1244.

"Where the contractual obligations are mutual and reciprocal, . . . article 1077 attaches and, . . . the aggrieved party is entitled to a choice between 'two procedural remedies . . . recission [of the contract or] the demand for the performance of the obligation; and in both cases the accessory remedy of indemnity for damages." *Waterproofing Sys.*, 2006 U.S. Dist. LEXIS 98605, at *37-38 (alterations in *Waterproofing Sys.*) (quoting *Ayende v. Crespo*, 38 P.R.R. 127, 133, 38 P.R. Dec. 141 (1928)). When a party has breached an "accessory" or "complimentary" obligation, in other words, obligations that "do not constitute the real consideration for executing a contract and which are incorporated into the same to complete or clarify the contracting parties' stipulations," *Dopp*, 38 F.3d at 1246 (quoting *Ramirez*), the breach "'may trigger an action for damages or any other action that the circumstances of each case warrant,' but such a breach may 'never' give rise to a rescissory action." *Id.* (quoting *Ramirez*); *see also Waterproofing Sys.*, 2006 U.S. Dist. LEXIS 98605, at *37. In other words, the breach of a non-reciprocal obligation does not mean that the non-breaching party need no longer comply with its contractual obligations.

### a.    Analysis

At the heart of Compass' argument is the contention that because the jury found in favor of Compass on its counterclaim, that necessarily means that Holsum breached a reciprocal obligation under the contract, releasing Compass from its performance obligations and meaning that Holsum cannot recover in contract against it.

Preliminarily, in its motion, Compass explains that the doctrine of *Exceptio Non Adimpleti Contractus* is part of the law of Puerto Rico.   *Compass Mot. for JMOL* at 8-9 ("Puerto Rico adheres to the doctrine of *Exceptio Non Adimpleti Contractus*, which states that a breaching party cannot claim a breach from the other contracting party").   However, Compass never requested a jury instruction setting forth this concept to the jury nor did the Court instruct the jury on this concept of Puerto Rico law.   After the Court gave its final instructions, Compass did not object to the instructions as given.   Therefore, Compass has waived the right to claim that the jury erred in failing to apply a legal concept that the jury was never instructed on.   The only basis for the Court to review Compass' *Exceptio Non Adimpleti Contractus* argument is plain error that affected substantial rights, which the Court does not find in this case.

To explain, prior to trial, Compass submitted a set of proposed instructions to the Court.   *Mot. Submitting Def. and Countercl. Pl.'s Proposed Jury Instructions and Verdict Forms*, Attach. 1, *Counter-Pl.'s Proposed Instructions at the Beginning of Civil Trial* at 1-34; *Counter-Pl.'s Proposed Instructions at the Close of Evid.* at 35-59 (ECF No. 180).   Although Compass cited numerous substantive provisions of Puerto Rico

11

law, Compass did not cite 31 L.P.R.A. § 3017 of the Puerto Rico Civil Code nor did Compass refer to the doctrine of *Exceptio Non Adimpleti Contractus* in its proposed instructions. *See id.* at 1-59. Accordingly, the Court did not instruct the jury on this concept of Puerto Rico law because Compass never asked the Court to do so, and Compass offered no objections to the Court's final instructions.

Federal Rule of Civil Procedure 51 provides:

> **(1)** *Assigning Error.* A party may assign as error:
>
> **(A)** an error in an instruction actually given, if that party properly objected; or
>
> **(B)** a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected.

FED. R. CIV. P. 51(d)(1)(A)-(B). As the Court never actually gave an instruction to which Compass properly objected, Rule 51(d)(1)(A) does not apply, and as Compass never properly requested an instruction that the Court refused to give, Rule 51(d)(1)(B) does not apply.

This means that Compass' claim of error must be analyzed under the plain error standard:

> **(2)** *Plain Error.* A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights.

FED. R. CIV. P. 51(d)(2). The First Circuit has written, "Just as actions have consequences, omissions too have consequences. It is black-letter law that claims of instructional error not seasonably advanced in the district court can be broached on appeal only for plain error." *Sindi v. El-Moslimany*, 896 F.3d 1, 20 (1st Cir. 2018).

"To establish plain error, a party must show '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001)). "[R]eversals for plain error are 'hen's teeth rare' in civil cases." *Id.*

Applying a plain error standard or even without a plain error standard, the Court rejects Compass' claim of error here. The Court disagrees with Compass because the jury: (1) could have awarded Compass breach of contract counterclaim damages solely based on Holsum's failure to pay installation fees, which were not part of the original contract; (2) could have reasonably concluded that Holsum breached a non-reciprocal portion of the contract and thus Compass was not excused from performing; and (3) could have reasonably concluded that both parties could have been awarded damages for breach of contract at trial because Compass never sought recission of the contract but instead sought damages with its counterclaim.

First, there is a sufficient evidentiary basis for the jury to have concluded that Holsum breached a non-reciprocal obligation that did not relieve Compass of its duty to perform its part of the contract. In *Casco, Inc. v. John Deere Construction & Forestry Company*, a jury awarded the plaintiff damages under Puerto Rico Law 75 pursuant to the parties' distribution agreement and also awarded damages to the defendant on its counterclaim for unpaid invoices. 2017 U.S. Dist. LEXIS 54045, at *1. In post-trial briefing, the plaintiff argued that it was improper for the jury to have awarded the defendant damages because the defendant had breached the

parties' distribution agreement.  *Id.* at *17.  The district court observed that the contract had already terminated at the time of the lawsuit was filed, and the plaintiff "did not seek specific performance from the jury, and the jury awarded it damages" and thus Article 1077 did not apply.  *Id.* at *18.

In addressing the plaintiff's argument under the doctrine of *exceptio non adimpleti contractus*, the district court noted that under the contract terms, the plaintiff "remained liable for any amounts due even after termination of the Agreement."  *Id.* at *19.  The *Casco* Court explained that the defendant was still "entitled to payment of goods ordered and received by [the plaintiff] before termination of the [contract]" and that "notwithstanding Article 1077, the dealer was bound to pay the principal amounts due for products purchased under the distribution agreement, despite the fact that the agreement was subsequently terminated without just cause."  *Id.* at *19-20.

Here, the jury could have reasonably concluded that Compass and Holsum breached non-reciprocal contractual duties to one another and that, as a result, neither was exempted from their contractual obligations and both could potentially recover under contract theories.  At trial Compass argued that Holsum breached its contract by failing to pay Compass' invoices for the cost of installation, including for services performed from August 15-23, 2017, totaling $48,920; services from August 24-September 5, 2017, totaling $26,517.97; services from September 16-23, 2017, totaling $10,647.87; and services from October 22-November 8, 2017, totaling $27,646.56.  *Holsum's Opp'n*, Attach. 7, *Further Jury Trial Proceedings* at 106:11-

107:23, 108:10-12 (ECF No. 313) (*Apr. 5, 2022, Tr.*).   Compass also argued that Holsum failed to pay the final ten percent due on the initial contract.   *Excerpt of Jury Trial Proceedings-Day 6* at 96:11-23 (ECF No. 279) (*Apr. 4, 2022, Tr.*).   However, the Holsum-Compass contract provides that "installation is not included in the above prices," *Compl.*, Attach. 1, *Contract* at 6 (*Contract*), and at trial, Compass' owner, Ronnie Smith, confirmed that Compass provided a quote for installation of its machines separate from the sales contract.   *See Apr. 4, 2022, Tr.* at 112:1-22 ("They can contact us for installation rates.  Also not included in the proposal are travel time, travel expenses, meal and laundry allowance of $55 per day per person. . . .  We give them how much we charge per hour for different personnel, for different types of days, regular time, over time, double time, holiday, travel time.  Then we will give them a block of time estimate"); *Apr. 5, 2022, Tr.* at 104:2-5 ("Q. . . . The contract between Compass and Holsum states that the installation of the tray loader was going to be [billed] in addition to the equipment, correct?  A. Yes, it was not included in the equipment quote").   Based on the contract language and trial testimony, the jury could have found that all installation fees were not a part of the contract entered into by the parties in March 2017.

Finding that the cost of installation services was not a part of the parties' initial contract, the jury could have reasonably concluded that Compass' breach of contract claim was based not on the initial sales contract for the tray loader and multiplier, but on a separate contract that arose between the parties when Compass provided installation services, which Holsum did not pay for.  Thus, contrary to

Compass' arguments, the jury could have found for Holsum on the basis of its contract claim as to the original sales agreement between the parties, but *also* found for Compass on its breach of contract claim based solely on Holsum's failure to pay for installation services which were undisputedly not included as part of the original sales contract.   Consistent with *Casco* and with the principles of *exceptio non adimpleti contractus*, a finding that Holsum breached its duty to pay Compass for installation services does not relieve Compass of its duty to meet contractual obligations under the sales agreement.   Installation services are not only collateral or "accessory" to the parties' original contract, but were, in fact, expressly *excluded* from the contract.

Furthermore, the trial record supports the conclusion that Holsum failed to pay installation fees. In Mr. Vigoreaux's deposition testimony he confirmed that:

> Q. Now, you recognize that Compass was at Holsum's facilities several times during 2017, in the months of September, and October, and November, correct?
> A. Correct.
> Q. And I think August, too, right?
> A. Yes.
> Q. And do you accept that none of the invoices submitted to Holsum have been paid to Compass for those visits?
> A. They are not prudent nor reasonable.
> Q. Not my question.   Do you acknowledge that Holsum has not paid them?
> A. They have not been paid because they are not prudent nor are they reasonable.
> Q. So your answer to my question is you acknowledged that you have not paid them, for whatever reason you have?
> A. They have not been paid.

*Julio Vigoreaux's Dep. Tr. Selected Portions for Use at Trial*, Attach. 1, *Feb. 5, 2020,*

*Dep. of Julio E. Vigoreaux-Carreras (Vol. 1)* at 79:3-22 (*Vigoreaux Tr., Vol. 1*) (ECF

No. 158).  Mr. Vigoreaux also testified that he discussed the invoices "[w]ith Miguel Pereira and Miguel Miranda, and . . . decided not to pay them."  *Id.* at 82:12-14.  On cross examination Mr. Pereira testified that he did not see the Compass invoices because he did not recognize the Compass employee's email address, *Jury Trial Proceedings-Day 4* at 107:2-5 (ECF No. 277) (*Mar. 31, 2022, Tr.*), but he later admitted that he corresponded with the same Compass employee in months prior and did receive the invoices.  *See e.g., id.* at 110:21-111:1.

Based on this testimony and the confirmed emails from Compass to Mr. Pereira containing the service invoices, the jury could have reasonably concluded that Holsum breached its contractual obligation to pay the invoices, and that these service invoices were separate and apart from the prior sales contract entered into in March 2017.  This reading of the record is not only consistent with the verdict, but also avoids Compass' *exceptio non adimpleti contractus* concerns.

Additionally, Compass failed to allege this reciprocal-obligation defense earlier in the proceedings and never attempted to rescind the contract.  *See Waterproofing Systems*, 2006 U.S. Dist. LEXIS 98605, at *38 (rejecting a plaintiff's Article 1077 argument because the plaintiff "ha[d] not attempted . . . to rescind the contract obligation but [instead sought] to obtain injunctive relief seeking performance and continuation of the contract").

Compass contends that "the jury found Holsum breached its contract with Compass, and that it was responsible for paying the full amount due for the *fabrication* of the tray loader," *Compass' Mot. for JMOL* at 2 (emphasis added), in

essence arguing that the favorable verdict on its counterclaim was based solely on the original contract. Compass also emphasizes that the jury awarded it $151,217.40 which is the total cost of its three service invoices plus the final ten percent payment due on the original contract. *Compass' Reply* at 3.

Although Compass has come up with a theory of how the jury came up with the final damages figure awarded to Holsum, Compass merely speculates as to the basis of the jury's award, as the jury did not explain how it came to the $151,217.40 figure (and it need not have). Moreover, the verdict form does not delineate whether the jury assigned liability to Holsum based on Holsum's failure to pay the final 10% of the cost of fabricating the trade loader, on Holsum's failure to pay the separate costs of installation, or both. As there is a plausible explanation of the verdict that would allow both parties to recover damages on their respective breach of contract claims, the Court will not speculate as to what other explanations, plausible or otherwise, might be consistent with the verdict. The Court therefore rejects Compass' contention that there is no plausible way for the jury to award breach of contract damages to both parties because the jury could have awarded damages to Compass for Holsum's failure to pay for installation services, which were not included as part of the original contract, and awarded damages to Holsum for Compass' breach of contract on the original tray loader sales contract.

Even if there was not a plausible reading of the verdict that allows both parties to recover for breach of contract damages, the Court would be extremely hesitant to grant judgment as a matter of law based solely on Compass' argument that it would

be otherwise inconsistent for both parties to recover for breach of contract. The Supreme Court explained in *Dunn v. United States*, 284 U.S. 390, 393 (1932) that "[c]onsistency in the verdict is not necessary" and the First Circuit has echoed this same view, as it is "substantial[ly] reluctan[t] to consider inconsistency in civil jury verdicts a basis for new trials." *McIsaac v. Didriksen Fishing Corp.*, 809 F.3d 129, 133 (1st Cir. 1987) (quoting *Merchant v. Ruhle*, 740 F.2d 86, 91 (1st Cir. 1984)).

Here, however, the Court need not puzzle over the possibility of an inconsistent verdict, because there is a plausible reading of the jury verdict that allows both Compass and Holsum to recover for breach of contract. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in collision with the Seventh Amendment").

### 2.     Breach of Contract Claim

Compass does not argue in its renewed motion for judgment as a matter of law that the jury could not plausibly have concluded that it breached the original sales contract with Holsum for the design and fabrication of the tray loader. Moreover, in its Rule 50(a) motion at trial, Compass only sought judgment as a matter of law on Holsum's negligence claim. *See Mot. for J. as a Matter of Law Against Holsum on its Negligence Claim* (ECF No. 254). Although Rule 50(a) "does not require technical precision in stating the grounds of the motion[,] [i]t does require that they be stated with sufficient certainty to apprise the court and opposing counsel of the movant's

position with respect to the motion." *Lynch v. City of Bos.*, 180 F.3d 1, 12 n.9 (1st Cir. 1999) (quoting 9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2533, at 310-11 (1995)).

However, "[a]s the name implies, a renewed motion for judgment as a matter of law under [Rule] 50(b) is bounded by the movant's earlier Rule 50(a) motion. The movant cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." *Correa v. Hosp. S.F.*, 69 F.3d 1184, 1196 (1st Cir. 1995)). In this case, Compass never contended that it was entitled to judgment as a matter of law on Holsum's breach of contract claim. Although it has not specifically addressed its own breach of contract liability in its Rule 50(b) motion, Compass argues that "Holsum did not provide sufficient evidence of a breach of duty in contract." *Compass' Mot. for JMOL* at 7. Because the Court concludes that both parties could have recovered for breach of contract, the Court proceeds to analyze the sufficiency of the evidence to support Holsum's claim for breach of contract against Compass and concludes that the evidence supports a jury verdict in favor of Holsum on its breach of contract claim.

The Holsum-Compass sales contract provides that Holsum would pay Compass a total of $376,640.00 in exchange for one 4-row sandwiching tray loader priced at $325,000.00, a 2-to-4 row multiplier integrated on one end of the creamer to meet the tray loader's 5-inch centerline, priced at $49,850.00, and 4x6 treated skids, priced at $1,800.00. *Contract* at 3-4. The "Product Description" section of the contract provides

that the Compass machine will be used to run the following cookies: Holsum Family

Tray Pack, Kay's, Bimbo Bote, and Cameo Cookies.  *Id.* at 2.

First, there was ample evidence on the record that the Compass tray loader

machine did not work:

> Q. Okay.  Is there anyone at Holsum that can testify that the Compass
>    tray loader cannot work?
> A. I can.
> Q. You['re] qualified to testify that the Compass tray loader did not
>    work?  If you say so, that's your testimony.
> A. I saw it working and it did not work.
> Q. So you would be the witness to at Holsum.  Is there any other witness
>    at Holsum that could testify that the Compass tray loader was
>    hooked up and did not work?
> A. Miguel [Pereira] can testify to that.
> Q. Has Holsum hired any expert to testify that the Compass tray loader
>    cannot work?
> A. This is not rocket science.  This either works or it doesn't.
> Q. Is it your testimony that both you and Mr. Miguel Pereira can testify
>    that the Compass tray loader cannot work with the system that
>    Holsum has presently constituted?
> A. Well, the way that the machine is right now, Ronnie [Smith] himself
>    knows it doesn't work.

*Julio Vigoreaux's Dep. Tr. Selected Portions for Use at Trial*, Attach. 2, *Mar. 10, 2020,*

*Dep. of Julio E. Vigoreaux-Carreras (Vol. 2)* at 39:13-40:12 (ECF No. 158) (*Vigoreaux*

*Tr., Vol. 2*).

In addition to establishing that the machine was inoperable, at trial Holsum

identified thirteen points of failure in the Compass machine including defects in the

pneumatic actuator, cookie sandwiches not adequately entering the multiplier,

cookies frequently falling off the machine, cookies falling off of the stacking wheel

supporting guides, poor cookie transfer to the "bayonets," cookies getting stuck in the

accumulator plate, broken cookies and debris falling into filled trays, cookies getting

crushed under the guide rail, and incorrectly depositing cookies into the trays requiring manual intervention afterward. *Apr. 5, 2022, Tr.* at 61:17-68:12. Although Compass offered its response to each of these alleged defects, a jury could reasonably conclude that Compass breached its contractual obligation to Holsum because the tray loader and multiplier were not operating correctly and were significantly damaging the product, rendering it unusable.

Furthermore, the jury could have concluded that Compass breached its contract with Holsum by selling the company an improperly designed or manufactured multiplier to connect the Peerless sandwiching machine and the Compass tray loader. Mr. Smith testified that the tray loader was originally designed to have a centerline of 5 inches, which could not accommodate both the Cameo Cookies and the round cookies. *Id.* at 82:10-83:12. Peerless was unwilling to accommodate Compass' centerline, so Compass recommended that Holsum purchase a multiplier to change and multiply the rows from the Peerless sandwiching machine, which has a 4.125-inch centerline, to the tray loader's 5-inch centerline. *Id.* at 82:15-18, 83:17-21. However, later in his testimony Mr. Smith admitted that, even when the tray loader was functioning well, the multiplier continued to have significant issues, even after adjustments were made. *See id.* at 107:15-18 ("A. . . . The problem is in the multiplier . . .. Q. That multiplier was manufactured by Compass, correct? A. That is correct"). Furthermore, Mr. Smith admitted that the multiplier and tray loader "might have worked" if both Cameo and round cookies were not being run simultaneously on the production line. *Id.* at 161:9-10. Based on this testimony, a

jury could conclude that neither machine was properly designed or manufactured for Holsum's needs, and that Compass recommended the multiplier to Holsum knowing that the machine could not accommodate both types of cookies, as the contract required.

Finally, the jury could have also concluded that Compass breached its contract based on the tray loader and multiplier's inability to handle round cookies, which were included in the contract as one of the cookie types to be run on this particular production line.  Compass' Mr. Smith testified that:

> Q. And by September 17, the Peerless machine was making the round cookies well, correct? Yes or no.
> A. I have no idea.  September 17 was the first day that they ran the round cookies.  I did not hear a complaint about them.
> Q. No complaints, right?
> A. I did not hear the complaints.
> Q. So they were well made, correct?
> A. I believe so.
> Q. . . . [Compass employee] Larry Estes told you that the round cookie did not settle well between the back two pusher pins of the bucket of the tray loader, correct?
> . . .
> A. Larry stated that, yes.
> . . .
> A. You keep saying "tray loader" but this is not the tray loader he's talking about.  He's talking about the multiplier which is not the tray loader. . . . There is a little issue in the multiplier.
> . . .
> Q. Larry Estes told you in the email that this issue that he is describing here was causing the slugs of round cookies to be messed up and create the scrap, correct?
> A. Yes, because we are losing some of them in the multiplier.
> Q. The multiplier was made by Compass, correct?
> A. Yes, there were two pieces made by –
> Q. Thank you.
> . . .
> Q. . . . Compass determined that in order to correct that situation, new parts had to be made to the machine, correct? Yes or no.

A. Yes.

. . .

Q. You said before that, by September 18, the Peerless machine was making the round cookies well, that there were no complaints about the round cookies.

A. No, you said it was making it well, and I said I didn't have information to the contrary.

Q. You said there were no complaints.

A. To me.

Q. So we should understand that they were made well, correct?

A. They were made adequately at least.

*Id.* at 97:10-102:19.

Based on this testimony, the jury could have reasonably concluded that Compass breached its contract with Holsum because Mr. Smith admitted that even if the tray loader itself was functioning, the multiplier connecting the sandwiching machine and tray loader, which was manufactured by Compass and included in the contract, was not working properly. Although this testimony was in reference to round cookies, not the Cameo Cookies at the heart of this litigation, the Compass-Holsum contract expressly specified that the tray loader and multiplier needed to run both round and Cameo cookies. Moreover, Mr. Smith admitted that, at this point, the round cookies were of sufficient quality and the Peerless machine was adequately sandwiching the cookies, which could reasonably lead the jury to conclude that, absent quality issues in production or sandwiching, the sole cause of the multiplier's failure was Compass' design or manufacturing. Based on this evidence the jury could have returned a verdict in favor of Holsum on its breach of contract claim against Compass because the machines provided by Compass were inoperable.

### 3.  Holsum's Negligence Claim

Even assuming that the only proper reading of the verdict is that the jury awarded Holsum damages based in tort, not contract, Compass would still not be entitled to judgment as a matter of law.

As a general rule, Article 1802, Puerto Rico's general tort statute, does not apply in the context of commercial transactions.  *Linares-Acevedo v. Acevedo*, 38 F. Supp. 3d 222, 228 (D.P.R. 2014) (citing *Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.*, 449 F.3d 85, 88 (1st Cir. 2006)).  As this District has explained:

> [a] plaintiff may bring a negligence claim based on a contractual relationship when there is both an alleged breach of contract *and* an alleged breach of the general duty not to negligently cause injury.  This general duty not to act negligently must arise out of conditions separate from the parties' contract.  If a plaintiff's damages arise exclusively from a defendant's alleged breach of contract, the plaintiff does not have a separate cause of action for negligence.

*Id.* (quoting *Nieves Domenech v. Dymax Corp.*, 952 F. Supp. 57, 65-66 (D.P.R. 1996)).

Assuming Article 1802 does apply, it provides that a person who "causes damage to another through fault or negligence shall be obliged to repair the damage so done."  31 L.P.R.A. § 5141.  To prevail on an Article 1802 tort claim the "plaintiff[] must establish three elements: (1) an injury, (2) a breach of duty, and (3) proximate causation of the injury."  *Velásquez-Vélez v. Molina-Rodríguez*, 327 F. Supp. 3d 373, 387 (D.P.R. 2018); *see also Irvine v. Murad Skin Research Lab'ys., Inc.*, 194 F.3d 313, 321 (1st Cir. 1999) (citing Article 1802 cases from the Puerto Rico Supreme Court); *Vazquez-Filippetti v. Banco Popular De P.R.*, 504 F.3d 43, 49 (1st Cir. 2007); *Marshall v. Perez-Arzuaga*, 828 F.2d 845, 847 (1st Cir. 1987) ("In Puerto Rico, just as in the

common law jurisdictions, foreseeability is the touchstone of extracontractual liability").

### a. Whether Compass Owed Holsum a Non-Contractual Duty of Care

"[D]uty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." *Vazquez-Filippetti*, 504 F.3d at 49 (citing *Ortiz v. Levitt & Sons of P.R., Inc.*, 1 P.R. Offic. Trans. 407, 101 P.R. Dec. 290 (1973)). "[A] defendant only breaches his duty if he acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." *Id.* To "foresee" means to "provide against, to anticipate, or to avoid an injury or danger." *Lopez v. Universal Ins. Co.*, 98 F. Supp. 3d 349, 356 (D.P.R. 2015) (quoting *López v. Cruz Ruiz*, 131 D.P.R. 694, 1992 Juris P.R. 130, 708 Offic. Slip Trans. At 11 (1992)). "[T]he requirement of foreseeability is not limited to requiring that the precise risk or consequences have been foreseen." *Baum-Holland v. El Conquistador P'ship, L.P.*, 336 F. Supp. 3d 6, 21 (D.P.R. 2018) (quoting *Pabón Escabí v. Axtmayer*, 90 P.R.R. 20, 90 P.R. Dec. 20, 25 (1964)). In a general, the tort claim plaintiff need not establish the applicable standard of care if it is the "generic 'reasonably prudent person' standard of care." *Vazquez-Filippetti*, 504 F.3d at 50.

To begin, the Court must first determine whether Compass owed Holsum a duty not to act negligently arising from conditions separate from the contract. In *Hamdallah v. CPC Carolina PR, LLC*, 556 F. Supp. 3d 34 (D.P.R. 2021), the district court, in what it described as a "close call," dismissed the plaintiffs' tort claims as arising out of their original contract claim. *Id.* at 49. In *Hamdallah*, the defendant

26

was to acquire several contiguous pieces of property from the plaintiffs and lease the entire property to Puerto Rico CVS Pharmacy. *Id.* at 39. After the deal between the defendant and CVS fell through, the plaintiffs sought damages "for breaching a general duty of care under Puerto Rico law by charging into a real estate development that, they claim, [the defendant] and CVS . . . should have known was doomed from the start." *Id.* The district court concluded that "even assuming without finding that [the defendant] and CVS pursued a real estate transaction that was somehow doomed to fail, the [plaintiffs'] damages vis-à-vis [the defendant] ultimately arise because of, and are intertwined with, the duties under the [property purchase] Agreements." *Id.* at 48. Furthermore, it explained that the defendant's "duty to the [plaintiffs] would not have arisen but for the [purchase agreements], and recourse for the failure of the project is specifically covered in the Agreements" and, as such, "it [was] clear that the [plaintiffs] [were] attempting to circumvent the Agreements by virtue of tort claims." *Id.* at 49. *See also CPC Carolina PR, LLC v. P.R. CVS Pharm., LLC*, 494 F. Supp. 3d 144, 156 (D.P.R. 2020) (concluding that CPC Carolina could not recover in tort from CVS pharmacy because "all of CPC Carolina's alleged Article 1802 damages exclusively arise from CVS's alleged breach of the Ground Lease").

In *Lincoln Road Productions v. Reign Entertainment Group*, No. 12-1895 (JAG/BJM), 2014 U.S. Dist. LEXIS 203374 (D.P.R. Sept. 8, 2014), the district court dismissed the plaintiff's separate negligence claims because the "alleged breach of a duty of care [was] intertwined with their alleged breach of contract" claim. *Id.* at *14. The parties had entered into a promoter agreement for an exhibition basketball game.

*Id.* at *3.  The plaintiff began selling and publicizing the event after the defendants dismissed its concern that the game might be cancelled (even though the game was, in fact, cancelled after than 9000 tickets were sold).  *Id.* at *3-4.  The district court rejected the plaintiff's argument that "[the defendants] owed a duty to fulfill their contractual obligations, failed to take reasonable care in their obligations and that their actions, negligence, and omissions were the proximate cause of the cancellation of the Exhibition game" because the alleged injuries "arose directly from the defendants' failure to hold the game as promised, conduct which form[ed] the basis of the breach of contract claim."  *Id.* at *14 (internal quotation marks omitted).  *See also Burk v. Paulen*, 100 F. Supp. 3d. 126 (D.P.R. 2015) (dismissing a plaintiff's negligence claim because the "Plaintiff [was] claiming that his damages arising from Defendants' alleged negligence ar[o]se from Defendants' alleged breach of contract because the duty under the purported contract is the same as the duty arising out of the negligence claim—that being the duty to promote his program to reach a network deal").

Here, the jury could have concluded that Compass owed Holsum a reasonable duty of care in the installation and commissioning[1] of the tray loader machine and in the coupling of the tray loader and sandwiching machine and that such a duty was separate and apart from its duty under the contract to provide the machine itself.  As

---

[1]    At trial, Mr. Smith explained that to him installation means "bolting [the machinery], powering it up and making sure that it's ready to function" and commissioning means the process of "bringing the bakery's product to that equipment."  *Apr. 4, 2022, Tr.* at 29:3-8.  *See also id.* at 15:15-20 ("So the installation, we physically are bringing something in.  We are bolting it down.  We're bringing plant air and power to it.  We may be connecting it to another machine.  Then they kind of turn it over and make[] sure everything moves.  At that point, it's considered installed.  Now we need to run product and that's commissioning").

the Court explained earlier in this Order, installation was not included in the Holsum-Compass contract, nor was commissioning. Additionally, the Holsum-Compass contract does not include specific provisions as to the coupling of the Peerless and Coupling machines, either during testing in Georgia before the machines were shipped to Holsum, or during the installation and commissioning process. Thus, a reasonable jury could conclude that Compass owed Holsum a duty of care that was separate and distinguishable from the contractual obligation which pertained only to the design and fabrication of the tray loader.

This case is distinguishable from *Burk* because the basis for the negligence claim—the duty to install and commission the tray loader—is not included in the contract, and therefore does not arise from the parties' explicit contractual obligations. This case is similarly distinguishable from *Lincoln* and *Hamdallah* because any damages sustained as a result of failed installation and commissioning were not necessarily the but-for result of failed design or fabrication. In *Lincoln* the alleged damages flowed directly from the cancelled game, which was at the heart of the contractual obligation, whereas here, Holsum's economic damages could have flowed from failed installation and commission, which were not covered by the contract, rather than just from machine design and fabrication, which were.

In *Hamdallah*, the district court concluded that but-for the parties' purchase agreement, the alleged duty would not have arisen, but here, Compass' alleged duty in tort is not quite so intricately interwoven. Although it is true that but-for the initial contractual obligation to manufacture and fabricate the tray loader, Compass

would not have incurred the duty to install and commission the tray loader, this but-for causal connection is not as direct, or as exclusive, as it was in *Hamdallah*. Even if Compass had not manufactured the tray loader but had simply installed and commissioned a machine that was already manufactured, Compass would still owe a duty to Holsum to act reasonably in its installation. The Court therefore cannot conclude that Compass' non-contractual duty is so intertwined with its contractual duty that the jury could not reasonably conclude that it owed a duty of care to Compass.

Compass' expert witness, Toby Strickland, explained that there are typically three steps to integrating machinery into a production line: Commissioning, Qualification, and Validation, and that commissioning is primarily "vendor driven" activity under the general direction of the project manager. *Apr. 5, 2022, Tr.* at 183:14-186:14. As a "vendor driven" activity, the jury could have reasonably come to the conclusion that Compass, as the vendor of the tray loader, had a duty of care during the commissioning process. This is further supported by Mr. Pereira's testimony that Holsum perceived both Compass and Peerless to be experts regarding their respective machines and that Holsum was relying on that expertise. *See Mar. 31, 2022, Tr.* at 6:21-24 ("Well, each person is an expert in his or her own area. I am an expert in production lines. Peerless is an expert on sandwiching machines and I thought Compass was an expert on tray loaders"). In sum, the jury could infer that Compass owed Holsum a duty of care in the installation, commissioning, and coupling

of the machinery based on industry practice that installation and commission was a primarily "vendor driven" activity.

During his testimony, Mr. Smith explained that Compass agreed to have Peerless send the sandwiching machine to Compass' facility in Georgia so that Compass could couple and test the machines. Mr. Smith explained that Compass connected the two machines to test the mechanical and electrical connections and ran them until they no longer saw any problems. *Apr. 5, 2022, Tr.* at 92:19-93:14; 122:5-7. Mr. Smith emphasized the importance of wiring the machines correctly, making sure that the controls and signals are being exchanged between the machines, and leveling everything properly. *Id.* at 125:22-126:8. On cross-examination Mr. Smith confirmed that "the testing of the product flowing from the sandwich to the tray loader . . . did go well" and that he was not aware of any problems occurring during testing in Georgia. *Id.* at 93:12-14; 94:13-15. However, all parties agreed that upon installation and commissioning in Puerto Rico, the tray loader did not function properly and that the multiplier, which connected the sandwiching machine, and the tray loader were having issues. *Id.* at 168:20-23. If the jury accepted Mr. Pereira's testimony that the cookies met the specifications Holsum gave to Compass and Peerless, and the tray loader, multiplier, and sandwiching machines all worked well when coupled during the testing in Georgia, a reasonable jury could infer that Compass may have negligently or unreasonably installed or commissioned the tray loader and multiplier and thus breached its duty to care to Holsum.

### b.    Economic Damages

Finally, as to damages, Compass contends that Holsum cannot prevail because the jury damages arise "exclusively" from the alleged breach of contract and the "losses allegedly suffered by Holsum are purely economic losses–there was no evidence at all presented by Holsum of damages to person or property." *Mot. for JMOL* at 2.  The Court must therefore determine whether Holsum can recover for purely economic damages in its tort action.

In *Isla Nena Air Services v. Cessna Aircraft Company*, 449 F.3d 85 (1st Cir. 2006), the First Circuit was faced with determining whether the "economic loss" rule applies under Puerto Rico law in a case involving allegedly defective airplanes.  *Id.* at 88.  The First Circuit explained that the doctrine would generally preclude tort recovery where "a defective product harms only the product itself (instead of a person or other property)," and that this claim-barring principle applies under Puerto Rico law.  *Id.* at 87 (citing Restatement (Third) of Torts: Prod. Liab. § 21, comment d. (1998)) ("[A] machine that becomes inoperative may cause the assembly line in which it is being used to break down and may lead to a wide range of consequential economic losses to the business that owns the machine.  These losses are not recoverable in tort").  However, the *Isla Nena* Court noted that the "economic loss rule" is "peculiar to the law of products liability."  *Id.* at 90 (differentiating *Ramos Lozada v. Orientalist Rattan Furniture, Inc.*, 130 P.R. Dec. 712, 1992 Juris P.R. 74 (1992)).  Relying on *Betancourt v. W.D. Schock Corp.*, 907 F.2d 1251 (1st Cir. 1990), the *Isla Nena* Court concluded that the plaintiff could not recover under Article 1802 because "the

damage[s] suffered . . . arose exclusively as a consequence of a breach of contract" and were "essentially those for which the law of warranty is best suited." *Id.* at 90-91.

In *Mayaguez Economic Development, Inc. v. Federkiewicz*, No. 18-01692 (PG), 2020 U.S. Dist. LEXIS 215872 (D.P.R. Nov. 16, 2020), this District construed *Isla Nena* and *Betancourt* narrowly, limiting the economic loss doctrine to the factual circumstances before the court, namely, products liability and allegations of negligence arising directly from a contractual duty. *See Mayaguez Eco. Dev., Inc.*, 2020 U.S. Dist. LEXIS 215872, at *12-13. In *Mayaguez* the district court emphasized that the *Isla Nena* Court's interpretation of the rule was specific to products liability actions and relied on the premise that damages to the airplane would not have occurred but for the airplane purchase contract. *Id.* at *12 (quoting *Isla Nena*, 449 F.3d at 90). The *Mayaguez* Court further explained that the *Isla Nena* Court relied on *Betancourt* in concluding that the plaintiff could not recover because generally, as discussed above, a plaintiff cannot recover for negligence in the context of a commercial transaction. *Id.* at *12-13.

Applying *Isla Nena* and *Betancourt* to the facts at issue in *Mayaguez*, the district court concluded the economic loss rule did not bar recovery in a tortious embezzlement claim brought against a contracting party because the "tortious claim ha[d] nothing to do with product liability or a commercial transaction in the way provided by *Isla Nena* or *Betancourt*." *Id.* at *13. The district court asserted that "even if the Rule has been modified by other courts, [the] Counterclaimants not only fail[ed] to cite decisions that closely resembled [the case at hand] but also fail[ed] to

identify a single *binding* instance in which the Rule was applied to bar tortious claims that stem" from the type of tortious embezzlement conduct at issue in *Mayaguez*.  *Id.* (emphasis in original).

In light of the district court's conclusion in *Mayaguez*, the Court similarly concludes that the economic loss doctrine is not a bar to recovery in this case.  First, unlike *Isla Nena*, this case is not a products liability case, and under the *Mayaguez* Court's reading of that case, and *Isla Nena*'s own limiting language, it should not be broadly construed to apply outside of the products liability context.  *See Isla Nena*, 449 F.3d at 90 (stating that "the economic loss rule . . . is a rule peculiar to the law of products liability and applies only where a defective product harms itself"); *see also Westernbank P.R. v. Kachkar*, No. 07-1606 (ADC), 2009 U.S. Dist. LEXIS 153750, at *38 (D.P.R. Aug. 20, 2009) ("[A]s the Magistrate-Judge correctly concluded, the economic loss doctrine is not relevant to this [breach of contract, collection of monies, and breach and foreclosure of collateral] case because its narrow application lies solely in the law of products liability").  Similarly, although *Betancourt* barred recovery because Puerto Rico's negligence statute typically does not permit recovery in the context of a commercial transaction, the Court has already explained that, in this case, the jury could reasonably infer a duty existing outside of the contractual relationship between Holsum and Compass.  The Court therefore concludes that the economic loss rule does not apply in this case and Holsum did not necessarily have to allege harm to persons or other property in order to recover for negligence.

At trial, Holsum employee Ernesto Morales testified that because the tray loader did not work, Holsum had to increase the number of employees assigned to the line, hiring twenty-two employees in addition to the twelve originally anticipated, which Holsum estimated to cost approximately $413,613.00.  *Apr. 1, 2022, Tr.* at 77:18-24, 86:16-87:1.  Holsum also had to spend $25,151 to add additional components to the line to integrate these workers into the production line, *id.* at 77:25-78:3, and spent $5,223 on personnel lodging expenses while Compass installed and commissioned the machine.  None of these asserted costs included the amount due on the contract for the design and manufacture of the machine, which totaled $435,673.  *Id.* at 77:14-17.  In other words, Holsum did allege damages that the jury could have reasonably concluded resulted from faulty installation, commissioning, or coupling—separate and apart from any contractual damages.  This conclusion aligns with the Court's instructions to the jury, which stated that "[u]nder Puerto Rico law, in a pure breach of contract action, remedies are generally limited to those provided in the contract . . . [and] should place the wronged party in as good a position as that party would have been in if the breaching party had fully performed its obligations under the contract."  *See Ct. Exs. from Jury Trial* at 25 (ECF No. 264).

Moreover, it is foreseeable that failure to properly install a piece of machinery would result in an inoperable machine and inoperable production line.  A jury could conclude, in light of its conclusion that the Peerless machine was sufficiently operable and the fact that the tray loader and multiplier had worked in Georgia, that there was a causal connection between installation and damages.

Finally, the Court finds no reason to disturb this District's narrow, context-specific reading of *Isla Nena* and its application of the economic loss doctrine under Puerto Rico law where there is also ample evidence on the record from which a jury could have reasonably concluded that Compass breached its contract with Holsum. This is especially true as the verdict form specifically allowed the jury to find Compass liable either for breach of contract "and/or" negligence, *Verdict* at 1, which is what the jury did. Compass does not argue that the verdict form was improper and, unlike Peerless, it never offered detailed objections to the special verdict form.

### D.     Conclusion

The Court has identified multiple plausible ways in which the jury could have rendered a verdict in Holsum's favor that is consistent with Puerto Rico law and, therefore, the Court denies Compass' motion for judgment as a matter of law.

## III.    MOTION FOR A NEW TRIAL

### A.     The Parties' Positions

#### 1.     Compass' Motion

Compass renews its arguments that "the jury's award to Holsum sounds in tort, not contract" because the jury "awarded to Compass the final 10% due on the fabrication of the machine" which represented a "rejection of Holsum's contract defenses." *Compass' Mot. for New Trial* at 3. Compass explains that "Puerto Rico adheres to the doctrine of *Exceptio Non Adimpleti Contractus*, which states that a breaching party cannot claim a breach from the other contractual party" and that because the jury "found that Holsum breached its contract with Compass, [it] could not have then decided that Compass had an extra-legal *contractual* duty to perform

anyway." *Id.* (emphasis in original). According to Compass, any other conclusion would be "internally inconsistent." *Id.*

Compass argues that "[t]he verdict in favor of Holsum should be set aside, and a new trial on Holsum's negligence claim should be ordered" because "Holsum placed all of its eggs into the 'contract' basket" and quantified its damages "with regards to the defects in the manufacturing and design" of the Compass machine without presenting evidence of other damages to "Holsum's persons or property." *Id.* at 3-4 (emphasis omitted). It says that "there is just an utter absence of evidence of tort duty, breach, or damages" and that "when the alleged injuries arise out of the same conduct which forms the basis of the alleged breach of contract claim, and the alleged breach of duty of care is intertwined with the alleged breach of contract, a party cannot bring a separate claim for negligence." *Id.* at 5 (citing *Linares-Acevedo v. Acevedo*, 38 F. Supp. 3d 222, 228 (D.P.R. 2014)).

## 2. Holsum's Opposition

Regarding Compass' motion for a new trial and Compass' argument on inconsistent verdicts, Holsum cites the United States Supreme Court for the proposition that "[c]onsistency in the verdict is not necessary," and notes that the First Circuit has been "reluctan[t] to consider inconsistency in civil jury verdicts as a basis for new trials." *Holsum's Opp'n* at 8-9 (first quoting *Dunn v. United States*, 284 U.S. 390 (1932) then quoting *McIssac v. Didriksen Fishing Corp.*, 809 F.2d 129, 133 (1987)). "Whatever might have been the jury's rationale," Holsum submits that "there is more than sufficient evidence in the record to support the verdict against Compass." *Id.* at 9. It goes on to explain that because "[t]here are views of the case

that make[] the jury's answers to the special interrogatories consistent . . . no miscarriage of justice will result from upholding the verdict against Compass." *Id.*

### 3.    Compass' Reply

Regarding a new trial, Compass disagrees that a potentially inconsistent verdict in and of itself does not warrant a new trial because "where there is a way to view the verdict that makes it consistent, and a way on the other hand that makes it inconsistent, a court **must** adopt the consistent view." *Compass' Reply* at 4-5 (emphasis in original). Compass notes that Holsum failed to explain "how a consistent verdict would make Holsum liable for fabrication and unsuccessful installation of a machine where Compass itself was first in breach of contract to manufacture and install a functional machine." *Id.* at 5. Compass contends that "it stopped performing service visits upon Holsum's refusal to pay" and that "Holsum provides no countervailing authority requiring Compass to continue performing after a breach of contract." *Id.* Compass concludes that based on the jury's verdict, "we are certain that Holsum is liable for breach of contract." *Id.*

Compass argues that Holsum failed to address any arguments that Compass owed Holsum a duty separate from its contract or show that Holsum suffered damages not arising from contract because "[t]here is no such evidence." *Id.* at 6. Compass points to Mr. Pereira's testimony that Holsum's product was only saleable "after practically half of the cookies had to be taken out" and to Ronnie Smith's testimony that no tray loader on the market could have handled the amount of scrap coming out of the sandwiching machine. *Id.* Compass argues that Mr. Pereira's admission "preclude[s] any finding that the PT2 was producing cookies that were

'packageable' by a tray loader" and that "the great weight of the evidence is that the PT2 was utterly unable to deliver cookies within the contractual specifications Holsum had with Compass." *Id.* at 7.

### B.   Legal Standard

Federal Rule of Civil Procedure 59 provides that a "court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1).  The Court has discretion to grant a new trial "in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the [movant]; and may raise questions of law arising out of the alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Mesías*, 2021 U.S. Dist. LEXIS 57090, at *7-8 (quoting *Montgomery Ward & Co v. Duncan*, 311 U.S. 243, 251 (1940)).

Even if the Court has denied the movant's Rule 50 motion for judgment as a matter of law and even if substantial evidence supports the verdict, the Court can still grant a new trial if "a miscarriage of justice would result if the verdict were to stand, the verdict cries out to be overturned, or where the verdict shocks our conscience." *Id.* at *8 (quoting *Oriental Fin. Grp., Inc. v. Fed. Ins., Inc.*, 598 F. Supp. 2d 199, 205 (D.P.R. 2008)).  However, "[a] trial judge may not grant a motion for a new trial merely because he or she might have reached a conclusion contrary to that of the jurors." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598-99 (1st Cir. 1987).

### C.      Discussion

Compass makes the same arguments in its Rule 59 motion as it does in its motion for judgment as a matter of law, namely that because the jury awarded breach of contract damages to Compass on its counterclaim, the only logical explanation of the verdict in favor of Holsum is that it was based in negligence, not contract. Compass insists that the jury could not reasonably have found it negligent based on the evidence presented at trial.

Although a Court may conclude that a new trial is appropriate under Rule 59, even where it has denied a party's request for judgment as a matter of law under Rule 50, *see Mesías*, 2021 U.S. Dist. LEXIS 57090, at *8, the verdict here does not "shock the conscience," nor would allowing the verdict to stand result in a "miscarriage of justice."   As explained in the Court's analysis of Compass' Rule 50(b) motion, the verdict here is not inconsistent and does not necessitate the conclusion that the jury could have only found Compass liable to Holsum in negligence rather than in contract.   Under the Court's reading of the facts, and as the Court has already discussed: (1) both parties could recover for breach of contract under Puerto Rico law because the jury could have awarded damages to Compass solely for Holsum's failure to pay invoices which were not a part of the sales contract underlying the breach of contract theory; (2) inconsistency in the verdict is not an appropriate reason to grant a new trial, even assuming that the jury rendered a verdict in favor of Compass on Holsum's breach of the original sales contract; (3) Holsum presented sufficient evidence for a reasonable jury to conclude that Compass acted negligently in the execution of a duty to Holsum existing outside of the parties' initial contractual

relationship; and (4) the evidence at trial is sufficient to uphold a verdict that Compass breached its sales contract with Holsum because the tray loader and/or the multiplier, both of which were designed and manufactured by Compass, failed to properly load both Cameo and round cookies into trays without damaging the cookies or creating extra debris.  Furthermore, as the Court discussed above, to the extent Compass is claiming that the doctrine of *Exceptio Non Adimpleti Contractus* should have applied to this case, Compass failed to propose a jury instruction based on this doctrine and failed to object to the Court's jury instructions that did not refer to the doctrine.  Thus, Compass has not made out a claim the Court "reject[ed] . . . instructions to the jury." *Mesías*, 2021 U.S. Dist. LEXIS 57090, at *8.

Compass fails to present evidence that a substantial miscarriage of justice will result if the verdict to allowed to stand.  The Court denies Compass' motion for a new trial.

## IV.   MOTION FOR REMITTITUR

### A.   The Parties' Positions

#### 1.   Compass' Motion

Regarding its request for remittitur, Compass avers that "[i]n this case, the evidence is such that the verdict is so high as to deny justice from prevailing given the utter lack of proof on causation or any clarity as to a verdict based on either contract or negligence theories." *Compass' Mot. for New Trial* at 6.  It says that "[a] 'windfall' must be avoided" and that "[w]hen the proof of damage cannot be rationally related to any proof of causation from a negligence or contract claim, the result is inherently a windfall." *Id.* at 6-7.  In particular, Compass argues that mitigation of

damages is "[c]rucial to such assessment," noting that Holsum alleged "ongoing damages resulting from the additional personnel required for hand loading the cookies" but it "failed to seek the assistance of Benchmark, the first company it contacted about the tray loader, and it failed to seek the assistance of Peerless." *Id.* at 7. In particular, Compass points to Julio Vigoreaux's testimony where he confirmed that it was Holsum's decision and preference to hand pack the cookies to argue that Holsum "ignored its responsibility to mitigate its alleged ongoing damage[s] due to its preference for hand packing." *Id.* at 7-8.

Citing *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752 (1st Cir. 1996), Compass submits that "failure to mitigate damages requires remittitur *irrespective of whether the jury's verdict is based in contract or tort.*" *Id.* at 8 (emphasis in original). Compass says that the "over-used term of 'jury nullification' applies" because "[t]he jury award does not reflect the proof by Holsum in any way and ignores the absolute absence of proof refusing the uncontradicted evidence that no tray loader on the planet could process the cookies being produced by Holsum." *Id.* at 8-9. In conclusion, Compass argues that this case is unusual based on the jury's dual awards and that the only way "[t]o view the jury's verdict in a way that renders it consistent . . . means that Holsum's decision not to provide evidence of negligence—a duty, any acts, any damages—is fatal to its award." *Id.* at 9.

## 2. Holsum's Opposition

Holsum contends that Compass' motion for remittitur "is based solely on the faulty argument that Holsum did not mitigate damages." *Holsum's Opp'n* at 9. Holsum submits that Compass forgets that Holsum "testified, through Mr. Ronnie

Smith, that there are only <u>TWO</u> tray loader manufacturers in the United States: Compass and Benchmark," and that Benchmark had previously declined the project. *Id.* at 10 (emphasis in original).  It points to Mr. Pereira's testimony that "[t]he only one that could deal with that machine [the tray loader] was Compass" and further avers that "Holsum had no duty to seek a third party to remediate Compass' failure, but even if it did, under Compass' theory, Holsum sought the assistance of the only two available companies.  Compass, of course, failed to do it, and Benchmark declined the project." *Id.*  As to Compass' argument that Holsum should have contacted Peerless for assistance, Holsum asserts that "[b]y Compass' own admission, Peerless was not a tray loader manufacturer, so Holsum had no duty to consult Peerless on this issue." *Id.* at 11.

Regardless, Holsum submits that it did in fact mitigate damages, "first, by providing everything Compass asked for to perform installation (sample cookies, additional fees for expedited installation, etc.), and later, by setting up, at its own cost, a work table to mitigate the losses caused by Compass' failure to install its tray loader." *Id.* at 11.

### 3. Compass' Reply

Regarding its remittitur argument, Compass maintains that adjusting Holsum's award downward is appropriate because the award "(1) . . . ignores the Pereira admissions as to the scrap produced and, thus, the impossibility of any tray loader packaging these cookies as well as what the uncontroverted testimony of Ronnie Smith established and (2) it is completely divorced from the evidence submitted at trial, both with respect to the nature of the duty that Compass had, as

43

well as with the uncontroverted evidence that Holsum made no attempt to mitigate its damages." *Compass' Reply* at 8.

Regarding mitigation, Compass asserts that "Pereira speculates that Compass alone, among all of the world's engineers, could incorporate their tray loader" but failed to "provide any evidence supporting this speculation, [and] admitted that he did not actually seek anyone else out to incorporate the machine" *Id.* It says that "Holsum offered no evidence at trial that other parties were incapable or unwilling to undertake such a task." *Id.* Finally, Compass reiterates its argument, relying on *Cambridge Plating Co.*, that Holsum's failure to mitigate its damages warrants reduction of its award because there was evidence on the record that "it preferred hand-packing, and it sought damages relating to hand-packing as opposed to automated packing for *years*." *Id.* at 9 (emphasis in original). In sum, Compass submits that "[t]he court need not contort itself imagining how Compass breached its contract with Holsum when we *know* Holsum breached its contract with Compass." *Id.* (emphasis in original).

B. **Legal Standard**

"[R]emittitur is defined as the process by which a court compels a plaintiff to choose between the reduction of an excessive verdict and a new trial." *Mesías*, 2021 U.S. Dist. LEXIS 57090, at *9-10 (quoting 11 James Wm. Moore, MOORE'S FEDERAL PRACTICE 3D, 12 § 59.13[2][g][iii][A] at 59-82). The Court "will not disturb an award of damages because it is extremely generous or because [the Court] think[s] the damages are considerably less." *McDonough v. City of Quincey*, 452 F.3d 8, 22 (1st Cir. 2006) (quoting *Koster v. Trans World Airlines*, 181 F.3d 24, 34 (1st Cir. 1999)).

Instead, the movant "must establish that the award 'is so grossly disproportionate to any injury established by the evidence as to be unconscionable as a matter of law.'" *Id.* (quoting *Koster*, 181 F.3d at 34). Indeed, the "the extent of distortion that warrants intervention . . . require[es] such awards to be so large as to 'shock the judicial conscience,' 'so gross or inordinately large as to be contrary to right reason,' so exaggerated as to indicate 'bias, passion, prejudice, corruption, or other improper motive,' or as 'clearly exceed[ing] that amount *any* reasonable man could feel the claimant entitled to.'" *Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir. 1991) (emphasis in original) (quoting *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983)).

The First Circuit has further expressed its reluctance to condone after-the-fact reductions in damages awards because "[t]he jury heard the testimony, and it was up to its members to evaluate it and the witness' demeanor and credibility." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 236 (1st Cir. 2006). As a result, the First Circuit has concluded that "[t]ranslating legal damage into money damages – especially in cases which involve few significant items of measurable economic loss – is a matter peculiarly within a jury's ken; [f]or just this reason, [w]e rarely will override the jury's judgment on the appropriate amount of damages to be awarded." *Id.* (alternations in original) (quotation marks omitted). The Court has "broad discretion . . . to affirm the jury's award of damages because of [its] . . . familiarity with local community standards and with the witnesses' demeanor at the trial." *Brown v. Freedman Baking Co.*, 810 F.2d 6, 11 (1st Cir. 1987).

### C.     Discussion

The jury found Compass liable on Holsum's breach of contract and/or negligence claim and awarded Holsum damages in the amount of $518,295.00, *Verdict* at 2, which Compass says, "is so high as to deny justice from prevailing given the utter lack of proof on causation or any clarity as to a verdict based on either contract or negligence theories." *Compass' Mot. for New Trial* at 6.  The Court disagrees and concludes that the evidence at trial supports not only the jury's liability determination, but also the damages awarded.

First, as explained above, the Court rejects Compass' contention that there was no logical basis for the jury to find it liable in contract or tort.  The Court further concludes that the damages awarded are supported by the record and are neither grossly disproportionate nor do they "shock the judicial conscience."  In particular, this District has concluded that a damages award that is "obviously lower" than what the jury could have awarded based on the record is "not inordinate nor shocking to the court's conscience." *Franceschi v. San Carlos Hosp.*, 326 F. Supp. 2d 257, 266 (D.P.R. 2004).  For example, in *Franceschi*, the district court upheld a damages award of $152,792 on a contract claim because it was lower than $195,072, which was the amount that the plaintiff would have been entitled to based on the record evidence. The same is true here. In his testimony, Ernesto Morales explained that Holsum initially paid $435,673 to Compass "for the machinery, a fee to speed up the process of delivery and other components in the production line." *Apr. 1, 2022, Tr.*at 77:15-17.  He also testified that because the tray loader did not work "additional personnel . . . had to be added to the production line to perform the work that the tray loader

was supposed to perform of placing the cookies in the tray." *Id.* at 77:18-21. As a result, Holsum said it incurred an additional $413,613 in personnel costs to have employees manually load the cookie trays. *Id.* at 77:21-24. Mr. Morales identified a third group of unanticipated expenses relating to "components that Holsum had to acquire to build or to design . . . where these people were placed . . . that was not part of the initial project" which amounted to $25,151. *Id.* at 77:25-78:1-3. Finally, Mr. Morales explained that Holsum incurred lodging expenses while Compass personnel were in Puerto Rico attempting to install the tray loader. *Id.* at 78:4-8. In sum, Mr. Morales testified to Holsum's incurred expenses of $879,659. *Id.* at 78:7-8.

The amount awarded by the jury to Holsum, $518,295.00, is not only supported by the record because it is within the range of the economic damages corroborated at trial, *contra Correa-Carrillo v. Grupo Hima San Pablo-Fajardo Inc.*, No. 17-2253(RAM), 2022 U.S. Dist. LEXIS 57767, at *31-33 (D.P.R. Mar. 29, 2022) (concluded that an award of $8,000,000 in physical damages was excessive because the maximum physical damages justified in the case was $2,000,000); *Mesías*, 2021 U.S. Dist. LEXIS 57090, at *10-12 (concluding that an award of $350,000 for mental pain and suffering was inappropriate because it was based solely on "anecdotal" evidence), but is substantially less than what the jury could have reasonably awarded based on the record. Based on the trial evidence and applicable First Circuit law, the Court does not conclude that the jury award of $518,295 shocks the judicial conscience.

Still, relying on *Cambridge Plating Company v. Napco, Inc.*, Compass insists that it is entitled to remittitur because Holsum failed to prove that it mitigated damages. "The general principle is well settled that a party cannot recover for harms that its own reasonable precautions would have avoided." *Cambridge Plating Co.*, 85 F.3d at 772 (quoting *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 204-05 (1st Cir. 1995)). In his deposition testimony, when asked whether Holsum had "any intentions of trying to get a different tray loader to take the place of hand packing," Mr. Vigoreaux responded that the hand packing method was "working so well that [he saw] that as something very difficult for that to happen." *Vigoreax Tr., Vol. 2* at 38:6-11. Mr. Pereira testified that Holsum "had no other choice but to package manually" but also admitted that it never hired anyone else to come look at the tray loader, address the punch list, or put the tray loader back in the production line. *Mar. 31, 2022, Tr.* at 120:6-15. Mr. Pereira elaborated that Holsum never contacted anyone else to look at the tray loader because Compass was "[t]he only one that could deal with that machine" because "[t]hey are the ones who have knowledge about [the tray loader] machine and the programming software and anything that can be done to that machine." *Id.* at 121:2-9. Mr. Pereira did acknowledge, however, that he never contacted Benchmark, the other tray loader manufacturer, or Peerless, about the tray loader and neither company told Holsum that it was impossible for them to work on the machine. *Id.* at 121:10-122:4.

Based on the record, it was a question of fact for the jury whether Holsum mitigated its damages, and the jury could have reasonably concluded that Holsum

did act reasonably in its efforts to mitigate additional costs.  First, the jury could have reasonably concluded that only Compass could fix its machine.  The testimony at trial from both Mr. Pereira and Mr. Smith demonstrated that tray loaders are highly sensitive, complex machines requiring a great deal of technical and engineering expertise.  The jury could therefore have concluded that Compass was the only party with the technological and engineering expertise necessary to fix the machine.  Moreover, it could have reasoned that Peerless, a company that does not make tray loaders, could not reasonably fix the machine, and that Benchmark, which had already declined to work with Holsum, would be unable to assist as it had already turned down Holsum's request for a proposal for a tray loader.  *See Mar. 31, 2022, Tr.* at 131:3.  Mr. Smith testified that Compass and Benchmark were the only two of seven tray loader manufacturers in the world that "make [the] type of system where the sandwiching machine is connected directly to the tray loader."  *Apr. 4, 2022, Tr.* at 79:25-80:1-5.  Moreover, because the five remaining tray loader producers were international, the jury could have reasoned that reaching out to any of these manufacturers would have been more expensive than hand packing.  Finally, the jury could have reasonably concluded that, given Holsum's production timeline, hiring additional hand packers and continuing with its usual production strategy was the best way to mitigate damages to prevent Holsum from breaching its contract to manufacture cookies for Mondelez International, Inc.

Unlike in *Cambridge Plating Company* where the record was extremely clear that the plaintiff had failed to mitigate damages, here, it was an open question that

49

could have been reasonably decided in favor of either party. *See Cambridge Plating Co.*, 85 F.3d at 772 (concluding that failure to install a "missing" mixer for fifteen months where installation took only one day was an "inexcusable failure to mitigate damages").

Finally, the Court expressly instructed the jury that both Compass and Holsum had the legal obligation to mitigate damages caused by the other party. There was no objection to the Court's mitigation instruction and the Court assumes that the jury followed the Court's instructions. *United States v. Agramonte-Quezada*, 30 F.4th 1, 18 (1st Cir. 2022); *United States v. Owens*, 167 F.3d 739, 756 (1st Cir. 1999) ("[O]ur system of trial by jury is premised on the assumption that jurors will scrupulously follow the court's instructions. . . ."). Ultimately, because the jury could have reasonably concluded that Holsum mitigated its damages the Court rejects Compass' argument that the damages awarded to Holsum should be reduced. Simply put, the damages awarded are not grossly disproportionate, shocking, or clearly tainted with improper bias and motive. The Court denies Compass' motion for remittitur.

## V.    CONCLUSION

The Court DENIES Compass' Motion for New Trial under F.R.C.P. 59 (a)(1)(A) or in the Alternative Requesting Remittitur (ECF No. 288) and Compass' Motion for Judgment as a Matter of Law Against Holsum (ECF No. 289).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of October, 2022